# United States Navy-Marine Corps Court of Criminal Appeals

———————————————

**UNITED STATES**
Appellee

**v.**

**Nicholas S. BAAS**
Corporal (E-4), U.S. Marine Corps
Appellant

**No. 201700318**

Appeal from the United States Navy-Marine Corps Trial Judiciary.

Argued: 4 March 2019—Decided: 15 April 2019.

Military Judge:
Lieutenant Colonel Forrest W. Hoover, USMC.

Sentence adjudged on 22 June 2017 by a general court-martial panel consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, total forfeiture of pay and allowances, confinement for 15 years, and a dishonorable discharge.

For Appellant:
*Lieutenant Daniel E. Rosinski, JAGC, USN* (argued).

For Appellee:
*Lieutenant Kurt W. Siegal, JAGC, USN* (argued);
*Captain Brain L. Farrell, USMC* (on brief).

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

Before HUTCHISON, TANG, and LAWRENCE,
*Appellate Military Judges*

Senior Judge HUTCHISON delivered the opinion of the Court, in which Judge TANG and Judge LAWRENCE joined.

HUTCHISON, Senior Judge:

A general court-martial convicted the appellant, contrary to his pleas, of conspiracy,[1] making a false official statement, two specifications of rape of a child, two specifications of producing child pornography with the intent to distribute, and two specifications of distributing child pornography, in violation of Articles 81, 107, 120b, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 907, 920b, and 934 (2016).[2] The members convicted the appellant of raping his two-year-old son on two separate occasions and live-streaming the sexual acts on his cell phone to an unknown co-conspirator via the video chatting application, Skype.[3]

On appeal, the appellant raises eight assignments of error: (1) The military judge abused his discretion by admitting a laboratory test indicating the appellant's son tested positive for gonorrhea; (2) the military judge abused his discretion by failing to either suppress the positive gonorrhea test or to abate the proceedings after the laboratory and the hospital that treated the appellant's son destroyed the specimens, preventing a confirmatory test; (3) admission of the laboratory test results and related expert testimony violated the appellant's Sixth Amendment right to confrontation; (4) admission of the Skype text messages from the appellant's alleged co-conspirator violated the appellant's Sixth Amendment right to confrontation;[4] (5) the Article 120b, UCMJ, specifications fail to state an offense because the government failed to allege a specific sexual act, depriving the appellant of his constitutional rights to notice and protection against double jeopardy; (6) the trial defense counsel were ineffective for failing to challenge the government's failure to expressly

---

[1] The appellant was charged with two specifications of conspiracy—one alleging that he conspired to commit rape of a child and the other alleging that he conspired to produce and distribute child pornography. After the members returned guilty verdicts for both conspiracy specifications, the military judge consolidated the specifications into a single specification. *See* Record at 893-94.

[2] The members acquitted the appellant of an additional specification each of rape of a child, production of child pornography, and distribution of child pornography.

[3] Skype is a telecommunications application that provides video chat, instant messaging, and voice calls between computers, tablets, and mobile devices via the Internet. *See* Record at 716 ("Skype is a communication package that allows you to do . . . voice, audio, and chat messaging. The video is streaming, so you can't . . . save it . . . from within the Skype program.").

[4] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

allege a specific sexual act in each of the Article 120b, UCMJ, specifications; (7) the appellant's convictions for rape of a child, conspiracy, and false official statement are factually insufficient; and (8) the appellant's convictions for producing and distributing child pornography and conspiracy are legally and factually insufficient.[5] We find no prejudicial error and affirm.

## I. BACKGROUND

The appellant married TB in December 2013, and their son, GB, was born the following August. In October 2015, the appellant and TB separated and agreed to share custody of GB, with the child splitting time between his parents' homes. In June 2016, the appellant's new girlfriend, KM, suspected the appellant was cheating on her and looked through the appellant's cell phone while he was sleeping. After scrolling through various applications, KM opened the Skype application and found several instant messages between the appellant and a user named "Hailey Burtnett." In these messages, "Hailey Burtnett" directed the appellant, in graphic detail, to perform various sexual acts on GB, and, from the context of the messages, the appellant appeared to comply. Disgusted with what she read, KM took the appellant's phone, woke his roommate, AF, showed her the messages, and the two hastily left the appellant's apartment. KM and AF took the phone to AF's boyfriend, a fellow Marine, who advised KM to turn the phone in to the appellant's chain of command.

After the appellant's chain of command was notified, they contacted the Naval Criminal Investigative Service (NCIS), and the appellant was apprehended and subsequently interrogated by Special Agent CM. During the interrogation, the appellant denied ever inappropriately touching his son and claimed that "Hailey Burtnett" was a friend he met when he was a sophomore in high school in Alabama and that she now lived in Clearwater, Florida. The appellant explained that the sex acts described in their messages were simply fantasy and that, in fact, he performed the sex acts detailed in Hailey's messages on GB's green teddy bear:

> Anyways, this girl, she's weird, kinky, and she liked to talk like that. Well, [GB] had this little, green, teddy bear, and there was one point where she looked at it and she said, "Can you dress

---

[5] The appellant contends his conviction for conspiring to produce and distribute child pornography is both legally and factually insufficient, while his conviction for conspiracy to commit rape of a child is only factually insufficient. *See* Appellant's Brief of 21 May 2018 at 3. Although the military judge consolidated the conspiracy specifications into a single specification, *see supra* note 1, we will analyze each specification separately.

him up?" So this little, green, like, teddy bear—it talks. And I can tell you where it's at right now. But, I would dress him up, put a diaper on it and all that good stuff. And then she would, like, ask me to remove his clothing items and all that good stuff. And do weird stuff to it.[6]

The appellant admitted to Special Agent CM that the video chatting was only one-way; he would live-stream from his end, but he never saw "Hailey Burtnett" on video. Rather, she would only communicate with him via instant message during their Skype sessions. A subsequent forensic analysis of the appellant's phones and the Skype application confirmed that only the appellant's cell phone camera was activated during the Skype conversations with "Hailey Burtnett." No record of the streamed video was stored either on the cell phone or on the Skype application. Special Agent CM attempted to identify and contact "Hailey Burtnett." He contacted the school the appellant said Hailey attended and worked with local law enforcement officers in Alabama and Florida, but he was unable to find any record of "Hailey Burtnett." Forensic analysis of the Skype application and the call logs on the appellant's cell phone revealed that "Hailey Burtnett's" internet protocol (IP) address "resolved back to Spain, France, Iceland, and Germany," not Clearwater, Florida.[7] In addition, a review of the Skype search warrant return records provided by Microsoft Corporation indicated that the IP addresses associated with "Hailey Burtnett" had been used in Skype conversations with hundreds of other individuals around the world.

The appellant also told Special Agent CM during the interrogation that he recently tested positive for chlamydia and gonorrhea and insisted a physical exam on GB would reveal no signs of sexual abuse or sexually transmitted infections (STIs). Upon learning of the alleged abuse and the fact that the appellant had STIs, TB took GB to his normal pediatricians at Coastal Children's Clinic. Coastal Children's Clinic does not perform sexual assault forensic exams, but it is listed on the North Carolina roster as an approved facility for evaluating child sexual abuse allegations.

Dr. LK was the pediatrician who examined GB. She found no physical indications of sexual abuse, but she swabbed GB's rectum and ordered a test for gonorrhea and chlamydia from Diatherix Laboratories, a medical testing laboratory. Diatherix conducted a nucleic acid amplification test (NAAT) on the

---

[6] Prosecution Exhibit (PE) 10; Appellate Exhibit (AE) LXXV at 3-4. PE 10 is the video recording of two separate NCIS interrogations of the appellant—conducted on 16 and 21 June, respectively. AE LXXV is the transcript of those interrogations.

[7] Record at 733.

sample, which showed the sample tested positive for gonorrhea. Diatherix maintained the sample for ten days, then disposed of it pursuant to their standard operating procedure. After she received GB's positive test result, Dr. LK directed TB to take him to Carolina East Medical Center for additional confirmatory testing and treatment. Dr. LK explained that the NAAT completed by Diatherix Laboratories was a screening test that should be followed up with a culture test because the culture test was "the gold standard" for testing prepubescent children for gonorrhea.[8] Dr. LK called Carolina East, spoke with a triage nurse, and ordered urethral and rectal culture tests. However, Dr. LK's orders were improperly relayed to the treating physicians at Carolina East, who did not take urethral or rectal samples, nor did they order any confirmatory tests. Rather, the treating physicians merely took a urine sample, which they erroneously refrigerated, thus rendering the sample useless for a culture test. That urine sample was eventually destroyed. Carolina East physicians treated GB with antibiotics, which would rid GB's body of gonorrhea bacteria and render any further testing for gonorrhea "not useful."[9]

Before trial, the trial defense counsel moved to exclude the Diatherix test results, arguing that the test was unreliable. In a lengthy Article 39(a), UCMJ, motions hearing held pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the parties presented voluminous documentary evidence, including various scientific articles and Center for Disease Control (CDC) guidelines. In addition, the military judge heard the testimony of three expert witnesses. In support of his motion to exclude evidence of GB's positive gonorrhea test result, the appellant presented the testimony of Dr. MH, a pediatrician and expert in the field of STI diagnostics in children. She explained that the CDC does not recommend using NAATs for prepubescent boys because of concerns with validation testing and the fact that NAATs have a cross-reaction with other types of bacteria, resulting in a higher probability of false positives. Moreover, Diatherix's NAAT had not been peer reviewed or approved by the Food and Drug Administration (FDA). Dr. MH also explained that the positive predictive value of GB's test was too low to be reliable. The positive predictive value is the confidence that any one specimen's positive test result is, in fact, a true positive given the prevalence of the disease in the relevant population.[10] Dr. MH expressed her concern that because there is such a low prevalence rate for gonorrhea in prepubescent boys, the probability that GB's sample was a

---

[8] *Id.* at 622.

[9] *Id.* at 623.

[10] *See Id.* at 278 ("So a positive predictive value is your confidence in this one sample in front of me and its result. How confident am I that it is a true positive and not a false positive.").

true positive—regardless of how accurate or specific the test was—was only around 30%, "less than flipping a coin."[11] She concluded that the Diatherix NAAT was not a scientifically reliable test that could produce reliable results.

The government presented the testimony of Diatherix's executive vice-president and clinical director, Dr. DS. He explained that Diatherix was fully accredited by the American College of Pathologists (CAP) and certified in compliance with the federal Clinical Laboratory Improvement Amendments(CLIA) for testing bacteria like gonorrhea. Dr. DS testified that the specific NAAT used by Diatherix is called Target Enriched Multiplex Polymerase Chain Reaction (TEM-PCR). Portions of the TEM-PCR are proprietary and had not, therefore, been submitted for approval by the FDA, but the science behind it is the same as other commercially available NAATs. Dr. DS also explained Diatherix's certification requirements. CAP periodically sent Diatherix "blind" samples to test. Dr. DS noted that Diatherix has a 99% accuracy rate when testing the blind samples and a 100% accuracy rate for the particular gonorrhea target tested in this case. Finally, Dr. DS acknowledged that Diatherix normally does not conduct testing for forensic purposes, but he stated that if the TEM-PCR were to be used forensically, the same testing and procedure would have been used.

In addition to Dr. DS, the government presented the testimony of Dr. CH, an expert microbiologist. The government presented a report Dr. DS completed after reviewing the Diatherix testing procedures and the results of a validation study conducted to demonstrate the reliability of their TEM-PCR test.[12] Dr. CH echoed Dr. MH's concern about the low prevalence rate for gonorrhea in prepubescent boys and its effect on the positive predictive value, but testified that there was no way to quantify a precise prevalence rate. She also conceded that a NAAT is not the ideal test to run for pediatric STI detection due to the relatively low positive predictive value and the likelihood for a false positive when testing prepubescent children. As a result, like Dr. MH, she was less confident in a test result from a low-prevalence population, noting that "the resulting uncertainty about the likelihood of false positive results in a rectal swab from a young child represent a significant concern."[13]

Nonetheless, Dr. CH concluded that the Diatherix TEM-PCR produced scientifically valid results. Dr. CH reported that Diatherix's test accuracy—whether the test results agreed with a reference standard—was 94.6%. The precision standard, or the ability of the test to get the "correct results among

---

[11] *Id.* at 305.

[12] *See* AE L.

[13] *Id.* at 7.

618 tests performed on spiked samples," was 99.7%.[14] Likewise, the sensitivity of the test, or the ability of the test to detect gonorrhea at different concentrations, was comparable to the sensitivity of other commercially available tests. And finally, the test's specificity, or its ability to differentiate between organisms, revealed a perfect result—returning only positive results for gonorrhea from a panel that included 35 different organisms. Ultimately, Dr. CH concluded that the rectal swab sample taken from GB was "substantially more likely" to identify gonorrhea than anything else.[15]

The military judge made extensive findings of fact and concluded that the "Diatherix test [was] a reliable test based upon scientific principles and the members are best situated to determine the appropriate weight it should be given."[16] At trial, the government offered GB's positive gonorrhea test as a prosecution exhibit, and Drs. LK and CH testified consistent with their testimony at the *Daubert* hearing.[17] The trial defense counsel conducted an extensive cross-examination of each witness and pointed out the various flaws both with the testing procedures done in this case and with the use of NAATs in general to test for STIs in prepubescent children. In addition, Dr. MH testified in the defense case-in-chief and provided the members, in significant detail, her expert opinion that the test performed on GB was unreliable. Additional facts necessary to resolve the assigned errors are included below.

## II. DISCUSSION

### A. Admission of the Diatherix Laboratory Test

The appellant contends that the military judge abused his discretion in admitting GB's positive gonorrhea test and the expert testimony of Drs. LK and CH, after he conducted an incomplete *Daubert* analysis.

In *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993), our superior court analyzed the Military Rules of Evidence and gleaned six factors that must be established by the proponent of expert testimony: (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) whether the probative value outweighs other considerations.

---

[14] *Id.* at 6. The TEM-PCR reported the correct result in 616 out of 618 samples.

[15] Record at 284, 285.

[16] AE LXV at 10.

[17] Dr. CH testified in rebuttal after Dr. MH testified in the appellant's case-in-chief.

*Id.* at 397. Shortly after *Houser* was decided, the Supreme Court decided *Daubert*, in which the Court focused on the reliability and relevance of the evidence. The Court identified six factors to consider in determining whether scientific evidence meets the requirements for reliability and relevance:

(1) whether the theory or technique can be (and has been) tested;

(2) whether the theory or technique has been subjected to peer review and publication;

(3) the known or potential error rate;

(4) the existence and maintenance of standards controlling the technique's operation;

(5) the degree of acceptance within the relevant scientific community; and

(6) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

*Daubert*, 509 U.S. at 593-95. *Daubert* and *Houser* are consistent, with *Daubert* "providing more detailed guidance on the fourth and fifth *Houser* prongs." *United States v. Griffin*, 50 M.J. 278, 284 (C.A.A.F. 1999). Thus, "[b]oth the *Houser* and *Daubert* decisions provide . . . factors to consider in admitting expert testimony and evidence." *United States v. Henning*, 75 M.J. 187, 191 (C.A.A.F. 2016). The military judge considers these factors, in his role as "gatekeeper," to ensure that scientific evidence "both rests on a reliable foundation and is relevant." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007) (citing *Daubert*, 509 U.S. at 597; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).

We review a military judge's rulings to admit expert testimony and scientific evidence for an abuse of discretion. *See United States v. Thomas*, 49 M.J. 200, 202 (C.A.A.F. 1998). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or, (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010). Therefore, a military judge has a "range of choices and will not be reversed so long as the decision remains within that range." *Sanchez*, 65 M.J. at 148-49 (citations and internal quotation marks omitted).

We review *de novo*, however, the question of whether the military judge properly followed the *Daubert* framework and performed his role as gatekeeper. *United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014). If the military judge properly performs his gatekeeping function and follows the *Daubert* framework, we "will not overturn the ruling unless it is manifestly erroneous."

*Griffin*, 50 M.J. at 284. Indeed, the military judge "enjoys a great deal of flexibility in his or her gatekeeping role: 'the law grants a [trial judge] the same broad latitude when [he] decides *how* to determine reliability as [he] enjoys in respect to [his] ultimate reliability determination.'" *United States v. Billings*, 61 M.J. 163, 167 (C.A.A.F. 2005) (quoting *Kumho Tire Co.*, 526 U.S. at 142 (1999)) (emphasis in original).

On appeal, the appellant contends that the military judge misapplied *Daubert* and failed to reconcile his findings of fact with several issues raised by the defense expert, Dr. MH, that tend to undermine the conclusion that the Diatherix test was scientifically valid and, therefore, reliable. The appellant does not attack the military judge's findings of fact, but argues that he failed to consider additional evidence in reaching his conclusions. In his brief before this court, the appellant identifies the evidence of record supporting his arguments on each individual *Daubert* factor and argues that the military judge erred in finding the Diatherix test reliable. In particular, the appellant rehashes the arguments made at trial, supported by the testimony of Dr. MH: the Diatherix test was not tested for accuracy in identifying gonorrhea *in prepubescent children*, until *after* GB's positive result, and then, only in anticipation of litigation, thereby violating scientific testing principles; the test was not subject to publication and other NAATs that were peer-reviewed were not a satisfactory proxy because Dr. DS testified that the Diatherix test was unique; the potential for a false positive, given the low positive predictive value and the low prevalence of gonorrhea in prepubescent children, was extremely high; Diatherix failed to follow its own standards for testing rectal samples; and using a NAAT as a forensic test on prepubescent children without a confirmatory culture test is not widely accepted in the scientific community.

Having conducted our *de novo* review, we disagree and conclude that the military judge properly performed his gatekeeping function and applied the *Daubert* framework. The military judge made extensive findings of fact, which were supported by the voluminous record, articulated the correct legal principles under *Houser* and *Daubert*, and applied the law to the facts. "[W]here the military judge places on the record his analysis and application of the law to the facts, deference is clearly warranted." *Flesher*, 73 M.J. at 312. Applying the *Daubert* factors, the military judge found that the Diatherix test had been tested through both a validation study and from blind samples sent to the lab as part of Diatherix's lab certification through CAP and CLIA. The military judge acknowledged the defense expert's opinion that the validation data was not specific to pediatric rectal samples, and thus undermined its reliability, but concluded that the "exact validation data used does not invalidate the general

scientific principles behind the test itself."[18] The military judge also found that although the Diatherix test had not been subjected to peer review or publication, other NAATs with similar characteristics had been cleared by the FDA and subjected to peer review. Additionally, the military judge found that the CDC generally allows for the use of NAATs for STI testing and, thus, NAATs have been accepted within the laboratory testing community.

The military judge also examined the error rate and noted the concerns regarding the low positive predictive value, but concluded that the "likelihood of a false positive associated with the testing population does not undermine the scientific principles upon which the test is based."[19] In reaching this conclusion, the military judge specifically noted the conflicting testimony of Dr. MH—who testified alternately that the positive predictive value was "either 50% or lower, or 30%"—and Dr. CH who was unable to give a quantitative measure of the positive predictive value because there was no way to precisely determine the prevalence rate in the relevant population, or to even define the relevant population.[20] Citing *Sanchez*, the military judge specifically concluded that "[t]he existence of an error rate or disagreement over what that rate may be does not render the test inadmissible."[21] The military judge also concluded that the probative value of GB's positive gonorrhea test—as corroborating evidence that the appellant raped GB—was not substantially outweighed by its prejudicial effect.

There is also no merit to the appellant's assertion that the military judge failed to adequately address each of the *Daubert* factors. Specifically, the appellant argued that the military judge did not make any legal conclusion concerning Diatherix's adherence to any standards controlling operation of their test. "It is not necessary to satisfy every *Daubert* or *Houser* factor as the inquiry is a flexible one, and the factors do not constitute a definitive checklist or test." *United States v. Patrick*, 78 M.J. 687, 700 (N-M. Ct. Crim. App. 2018) (citation and internal quotation marks omitted).

Finally, we are also mindful that an appellate court is not the appropriate place to re-litigate a *Daubert* motion. *See United States v. Bush*, 47 M.J. 305, 311 (C.A.A.F. 1997). The military judge heard testimony from competing experts, acknowledged the flaws and potential problems with the Diatherix test, but nevertheless concluded that it was a scientifically valid test whose result

---

[18] AE LXV at 9.

[19] *Id.* at 10.

[20] *Id.*

[21] *Id.* (citing *Sanchez*, 65 M.J. at 151).

was reliable. We cannot say, given the record before us, that the military judge's conclusion was "manifestly erroneous." *Griffin*, 50 M.J. at 284. In short, the military judge understood and applied the correct law in deciding whether to admit GB's positive gonorrhea test results and the related expert testimony, and did not abuse his discretion.

**B. Preservation of Evidence**

The appellant next argues that the military judge erred in failing to abate the proceedings or suppress the results of GB's gonorrhea test after Diatherix destroyed the tested rectal swab and Carolina East Medical Center destroyed a urine sample, thereby preventing a confirmatory test. The military judge made extensive findings of fact and conclusions of law and ruled that the rectal swab tested by Diatherix and the urine sample drawn at Carolina East were "not of such central importance that they are essential to a fair trial."[22]

We review a military judge's denial of a defense motion to abate proceedings for an abuse of discretion. *United States v. Simmermacher*, 74 M.J. 196, 199 (C.A.A.F. 2015) (citing *United States v. Ivey*, 55 M.J. 251, 256 (C.A.A.F. 2001)). "An abuse of discretion occurs when a court's findings of fact are clearly erroneous or the decision is influenced by an erroneous view of the law." *Id.* (citing *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013)).

Rule for Courts-Martial (R.C.M.) 703(f)(2), MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.), provides, in pertinent part:

> a party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party.

In *Simmermacher*, the Court of Appeals for the Armed Forces (CAAF) reviewed R.C.M. 703(f)(2) and held that a military judge abused his discretion when he failed to abate proceedings related to a charge of wrongful use of cocaine after the Naval Drug Screening Laboratory destroyed Simmermacher's urine sample. 74 M.J. at 202. The Court held that "R.C.M. 703(f)(2) is an additional protection the President granted to servicemembers whose lost or destroyed evidence fall within the rule's criteria" and goes beyond constitutional

---

[22] AE LXXII at 4.

due process standards, which require a showing of bad faith on the part of the government. *Id.* at 201. Thus, when seeking abatement because relevant, material evidence was destroyed or lost, the defense must show that: (1) the evidence is of such central importance to an issue that it is essential to a fair trial; (2) there is no adequate substitute for the evidence; and (3) the defense was not at fault for the evidence being destroyed. *Id.* at 201-203; R.C.M. 703(f)(2).

The appellant argues that the rectal swab taken from GB was used by the government to prove that GB did, in fact, have gonorrhea. Since gonorrhea can only be transmitted through sexual activity, the rectal swab and urine sample taken at Carolina East were, according to the appellant, of central importance to whether he committed a sexual act upon GB. With no ability to retest the rectal swab or to test the urine sample taken at Carolina East, the appellant argues the samples were essential to a fair trial.

First, we note that the appellant does not identify any erroneous findings of fact from the military judge's ruling, nor does he identify any rule or binding law that the military judge failed to consider. Rather, the appellant attacks the military judge's conclusion that the samples were not of such central importance to an issue that they were essential to a fair trial. Therefore, we examine whether the military judge's decision was influenced by an erroneous view of the law.

In *United States v. Manuel*, 43 M.J. 282 (C.A.A.F. 1995), a case that predates *Simmermacher* by 20 years, the CAAF upheld a lower court decision excluding the results of a positive urinalysis after the sample tested had been lost or destroyed. *Id.* at 289. Citing R.C.M. 703(f)(2), the court concluded that since "the urinalysis result was the *only evidence* of the accused's wrongful use of cocaine, the urine sample was of central importance to the defense." *Id.* at 288 (emphasis added). In *Simmermacher*, the CAAF found "no meaningful distinction between the situation in *Manuel* and [Simmermacher's] situation." *Simmermacher*, 74 M.J. at 201. Reasoning that "[i]n both cases . . . the samples were the sole evidence of drug use," the court held that Simmermacher's urine sample was of such central importance that it was essential to a fair trial. *Id.*

The appellant's case is easily distinguished from both *Manuel* and *Simmermacher*. First, neither the rectal sample taken from GB by Dr. LK nor the urine sample taken at Carolina East were the "sole evidence" of the charges. *Id.* Rather, the Skype messages with "Hailey Burtnett" and the appellant's admissions to performing the sexual acts—although claiming he performed them on GB's green teddy bear—were proof of the sexual acts. Moreover, unlike the appellants in *Manuel* and *Simmermacher*, whose positive test results revealed the presumptive presence of a contraband substance, the appellant could not be convicted of any crime based *solely* on GB's positive gonorrhea test. Instead, GB's rectal swab simply provided corroboration that the appellant—who also

tested positive for gonorrhea—committed a sexual act upon GB. While relevant and material, this evidence was not of such central importance to whether or not the appellant committed a sexual act on GB that it was essential to a fair trial.

The appellant argues that "[e]vidence can still be of central importance to determination of an issue even if it is neither the only evidence on an issue, nor dispositive."[23] He points to *United States v. Seton*, No. 2013-27, 2014 CCA LEXIS 103 (A.F. Ct. Crim. App. 24 Feb 2014) (unpub. op.), in support of this proposition. In *Seton*, the Air Force Court of Criminal Appeals upheld a military judge's dismissal of the sole charge and specification alleging sexual assault after the government lost the surveillance video from the barracks where the alleged assault took place. *Id.* at *5-6, 18. Although the video was lost, a witness who had seen it confirmed that the video showed flirtatious behavior between the accused and his alleged victim that contradicted the alleged victim's testimony. *Id.* at *5-6. The Air Force Court agreed with the military judge that the video was of such central importance to an issue that was essential to a fair trial—the alleged victim's credibility—and that no adequate substitute existed because it had been over a year since the witness had seen the video and he only remembered some of the details. *Id.* at *16.

Again, the appellant misapprehends the nature of the rectal swab evidence. In *Seton*, the lost evidence was clearly exculpatory and called into question the veracity of the alleged victim's claims. *See Giglio v. United States,* 405 U.S. 150, 154 (1972) (finding exculpatory evidence includes "evidence affecting" witness "credibility," where the witness' "reliability" is likely "determinative of guilt or innocence"). Military courts have long recognized that evidence that is "clearly exculpatory" is of central importance to an issue that is essential to a fair trial.[24] But here, neither the rectal swab nor the urine sample was clearly exculpatory. Another case by our sister court illustrates this point. In *United States v. Terry*, 66 M.J. 514 (A.F. Ct. Crim. App. 2008), the Air Force Court held that the military judge abused his discretion in dismissing a rape specification after the government lost still photographs taken from a surveillance

---

[23] Appellant's Brief of 21 May 2018 at 65.

[24] *See United States v. Alston,* 33 M.J. 370, 374 (C.M.A. 1991) (affirming military judge's failure to abate the proceeding after concluding a potential witness's testimony was not "clearly exculpatory" and comparing the "clearly exculpatory" standard from military case law with then-existing R.C.M. 704(e), which authorized military judges to abate the proceedings against an accused if the convening authority failed to grant testimonial immunity to a witness and that witness' "testimony would be of such *central importance to the defense case that it is essential to a fair trial*") (quoting R.C.M. 704(e), MCM (1984 ed.) (emphasis in original)).

camera located outside a hospital examination room where the alleged rape occurred. *Id.* at 518, 520. Although the accused argued that the missing photos might prove useful at trial, unlike the missing surveillance video in *Seton*, there was no indication of what the missing photos captured. The court held that "[t]he possibility that potentially exculpatory images could have been found on the surveillance photos is simply too speculative to conclude that the missing photos were 'of central importance to an issue that is essential to a fair trial.'" *Id.* at 518. The appellant's claims here are similar. The appellant's assertion that a confirmation test would prove exculpatory or could potentially rebut the findings of the Diatherix test is purely speculative. Indeed, based on the substantial validation data from Diatherix, a confirmation test could have very well have further incriminated the appellant.

Because the samples taken from GB were not the only evidence related to the charges and were not otherwise clearly exculpatory, we agree with the military judge and conclude that the evidence was not of such central importance to an issue that was essential to a fair trial. As a result, the military judge was not influenced by an erroneous view of the law and did not, therefore, abuse his discretion in failing to abate the proceedings.

## C. Confrontation Clause

The Sixth Amendment's Confrontation Clause confers upon a criminal accused "the right . . . to be confronted with the witnesses against him." The Sixth Amendment, therefore, "prohibits the introduction of testimonial statements by a non-testifying witness unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Ohio v. Clark,* 135 S. Ct. 2173, 2179 (2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). Testimonial statements are those statements that are "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford,* 541 U.S. at 51 (alteration in original) (citation and internal quotation marks omitted). Testimonial statements include affidavits, custodial examinations, certifications, and lab reports that are "prepared in connection with a criminal investigation or prosecution." *Bullcoming v. New Mexico,* 564 U.S. 647, 658 (2011).

"Whether admitted evidence constitutes testimonial hearsay is a question of law reviewed *de novo*." *United States v. Tearman*, 72 M.J. 54, 58 (C.A.A.F. 2013) (citation omitted). The appellant argues that his Sixth Amendment right to confrontation was violated in two ways. First, he contends that the Diatherix lab report contained testimonial hearsay and was admitted into evidence through the testimony of Drs. LK and MH, neither of whom worked at Diatherix and neither of whom had independent knowledge of the testing procedures. Second, the appellant avers that the Skype messages from "Hailey Burtnett" were testimonial. We address each allegation in turn.

*1. Diatherix lab report*

The appellant argues that the Diatherix lab technicians who performed the testing on GB's rectal swab knew they were testing a rectal swab from a young child for gonorrhea. The Diatherix lab report indicated GB's age.[25] The appellant argues that "an *objective* witness in the position of the Diatherix analyst(s)' [sic] would reasonably believe that the NAAT results would be available for use at a later trial" because they knew a child of GB's age could not legally consent to sexual activity, and sexual activity is the only way he could have contracted gonorrhea.[26]

The appellant relies on the Supreme Court's decision in *Melendez-Diaz v. Mass.*, 557 U.S. 305 (2009), for his argument that the Diatherix lab report contained testimonial hearsay. Melendez-Diaz was convicted of distributing and trafficking in cocaine after the State presented "certificates of analysis" from laboratory analysts showing the results of a forensic test on the substance seized from him. *Id.* at 308. The forensic tests were completed by "a state laboratory required by law to conduct chemical analysis upon police request." *Id.* The Court held that the "certificates of analysis," which were sworn to before a notary public, were "quite plainly affidavits" that were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 310-311 (citation and internal quotation marks omitted). Because the analysts were aware of the affidavits' evidentiary purpose—which was stated plainly on the face of the "certificate"—the affidavits were testimonial statements. The Court, therefore held, that "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that [Melendez-Diaz] had a prior opportunity to cross-examine them, [he] was entitled to be confronted with the analysts at trial." *Id.* at 311(emphasis in original) (citation omitted).

The Supreme Court of Virginia rejected a claim similar to the one the appellant advances here. In *Sanders v. Commonwealth*, 711 S.E.2d 213 (Va. 2011), the court ruled that a lab report indicating that Sanders' minor daughter tested positive for chlamydia was nontestimonial because the report was a "medical report[] created for treatment purposes," which is a class of documents the Supreme Court explicitly excluded from the definition of testimonial hearsay. *Id.* at 218 (quoting *Melendez-Diaz*, 557 U.S. at 312 n.2). Distinguishing *Melendez-Diaz*, the Virginia court noted that the private laboratory in question was not a crime lab "testing for narcotics or DNA" and that the lab tested a sample submitted by a medical clinic, rather than from the police. *Id.*

---

[25] *See* PE 4 at 7.

[26] Appellant's Brief at 77 (emphasis in original).

at 220. As a result, the court held that a laboratory technician would not have reason to believe that the results of his or her testing would be used in a later trial. *Id.* The appellant's case is similar to *Sanders* and easily distinguishable from *Melendez-Diaz*.

While the Supreme Court has not articulated a comprehensive definition of testimonial statements, the CAAF has recognized that the analysis must be fact specific, "meaning that it is contextual, rather than subject to mathematical application of bright line thresholds." *United States v. Squire*, 72 M.J. 285, 288 (C.A.A.F. 2013) (citation and internal quotation marks omitted). We, therefore, take "an objective look at the totality of the circumstances surrounding the statement." *United States v. Gardinier*, 65 M.J. 60, 65 (C.A.A.F. 2007). The CAAF has developed "a set of factors" to guide this objective, but contextual, analysis:

> (1) the statement was elicited by or made in response to a law enforcement or prosecutorial inquiry;
>
> (2) the statement involved more than a routine and objective cataloging of unambiguous factual matters; and
>
> (3) the primary purpose for making, or eliciting, the statement was the production of evidence with an eye toward trial.

*Squire*, 72 M.J. at 288 (citing *Gardinier*, 65 M.J. at 65; *United States v. Rankin*, 64 M.J. 348, 352 (C.A.A.F. 2007)).

Our application of these factors reveals the similarities between the appellant's case and *Sanders*, and its differences with *Melendez-Diaz*. First, we observe that the Diatherix lab report was not made in response to a law enforcement or prosecutorial inquiry. Rather, TB took GB to his normal pediatrician after learning that the appellant had contracted gonorrhea and may have sexually assaulted GB. Dr. LK examined GB and, based on the allegations relayed to her by TB, took a rectal swab from GB and sent it to Diatherix to be tested. Dr. LK was a physician in private practice and was not employed by any municipal, county, state, or federal government. Likewise, Diatherix is a private, for-profit laboratory that conducts medical testing for hospitals and clinics, just like the private lab in *Sanders*. In contrast, the evidence tested in *Melendez-Diaz* was sent by police to a state-run laboratory which was required by law to forensically test the substance. The analysts' certificates identified the substance tested as cocaine, and those certificates were admitted into evidence pursuant to state law as "prima facie evidence of the composition, quality, and the net weight of the narcotic . . . analyzed." *Melendez-Diaz*, 557 U.S. at 309 (citation and internal quotation marks omitted).

Second, the Diatherix lab technicians who tested GB's rectal swab and completed the Diatherix lab report simply cataloged unambiguous factual matters.

That a statement contains "unambiguous factual matters" does not necessarily make it nontestimonial. *See United States v. Sweeney*, 70 M.J. 296, 302 (C.A.A.F. 2011). It is merely one "relevant consideration in determining whether statements are testimonial." *Squire,* 72 M.J. at 289. But since the Diatherix lab technicians were not engaged in a law enforcement function and were instead working in a "nonadversarial environment, where they conduct routine series of tests requiring virtually no discretionary judgments," their data entry on the Diatherix lab report merely cataloged the results of the tests performed. *United States v. Magyari*, 63 M.J. 123, 126-27 (C.A.A.F. 2006).

Finally, the primary purpose for making, or eliciting, the statement was not for evidence at trial, but to treat GB. Dr. LK is a pediatrician and GB was her patient. Dr. LK requested the lab report from Diatherix, a private medical laboratory, and Diatherix returned the report not to the police, but to Dr. LK, who then included it in GB's medical records. *See Clark*, 135 S. Ct. at 2182 ("Statements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers."). Thus, unlike *Melendez-Diaz*, in which case the forensic analysts understood that the primary purpose for their reports was for use as "prima facie evidence" at a future trial, there is nothing to suggest that the Diatherix laboratory technicians who tested GB's rectal swab understood that their report would be used for a non-medical purpose.

Rather, the record suggests that Diatherix, like the lab in *Sanders*, tested the rectal swab sample just as they would test any sample received from any medical clinic or practitioner. Moreover, unlike the certificates in *Melendez-Diaz*, there is no sworn attestation on the Diatherix lab report. Nor is there a statement on the lab report indicating the tests results were intended for evidentiary purposes. In fact, the Diatherix lab report contains no signatures, was not accompanied by any chain of custody documentation, and merely consists of a single page identifying the patient's name, the "ordering physician," the date the specimen was collected, received, and reported, the organisms tested for, and an "X" in either a column labeled "DETECTED" or "NOT DETECTED," for each organism.[27] In short, the Diatherix lab report "lack[s] any indicia of formality or solemnity that, if present, would suggest an evidentiary purpose." *Tearman*, 72 M.J. at 61. In *Tearman*, the CAAF found the lack of formality in various chain of custody documents and internal review worksheets integral to their ultimate holding that the documents were not testimonial. *Id.* The court concluded that the documents, like the Diatherix lab report, "utterly lacked attendant formalities, a characteristic that stands in stark contrast to

---

[27] PE 4 at 7.

the formal, affidavit-like certificates and memoranda at issue in . . . *Melendez-Diaz*." *Id.*

Having completed our contextual, objective analysis, we conclude that the Diatherix lab report was not testimonial and that the appellant was not denied his Sixth Amendment right to confrontation.

### 2. Hailey Burtnett Skype messages

The appellant argues that the admission of "Hailey Burtnett's" Skype messages violated the Confrontation Clause. We review the military judge's decision to admit or exclude evidence under an abuse of discretion standard. *United States v. Barnett*, 63 M.J. 388, 394 (C.A.A.F. 2006). When reviewing a mixed question of fact and law, such as the military judge's ruling on the admissibility of "Hailey Burtnett's" Skype messages, we apply a clearly-erroneous standard to the military judge's findings of fact, and a *de novo* standard to his conclusions of law. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004).

But, because the appellant raises his Confrontation Clause claims for the first time on appeal,[28] we review for plain error. *United States v. Jones*, 78 M.J. 37, 44 (C.A.A.F. 2018). "Plain error occurs where (1) there was error, (2) the error was plain and obvious, and (3) the error materially prejudiced a substantial right of the accused." *Id.* (citation and internal quotation marks omitted).

The Skype messages with "Hailey Burtnett" contain statements concurrently discussing the rape of GB. In response to the appellant's hearsay and relevancy objections, the military judge noted that the "overwhelming majority of the [Skype] messages from Hailey Burtnett are questions, requests, and instructions directed at the accused" and "do not have an underlying factual assertion that is being offered for the truth."[29] Additionally, to the extent the messages contained assertions being offered for the truth, the military judge found the messages to be *non-hearsay* as statements of a co-conspirator in furtherance of the conspiracy. *See* MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 801(d)(2)(E), MCM (excluding from the definition of hearsay a statement "made by the party's co-conspirator during and in furtherance of the conspiracy"). The military judge found by a preponderance of the evidence that such a conspiracy existed; that "Hailey Burtnett" and the appellant were "members of the conspiracy"; "that the conspiracy was ongoing during the date range of the

---

[28] The appellant moved the court-martial to exclude "Hailey Burtnett's" Skype message on hearsay and relevancy grounds, but did not cite the Sixth Amendment or argue that admission of the messages violated his rights under the Confrontation Clause. *See* AE XXXIV; AE LXI.

[29] Record at 397.

offered [Skype] messages"; and that "the statements were made in the further-ance of the conspiracy."[30] In finding that a conspiracy existed, the military judge relied on the content of the messages, the STI diagnoses of both the ap-pellant and GB, and the appellant's statements to NCIS.

We find support in the record for the military judge's findings and conclude that they are not clearly erroneous. We also agree with the military judge's conclusions that a conspiracy existed between the appellant and "Hailey Burtnett"; that it existed during the timeframe the messages were sent; and that the admitted messages were in furtherance of the conspiracy. Conse-quently, we conclude that the military judge did not abuse his discretion in admitting the Skype messages as non-hearsay statements of a co-conspirator, pursuant to MIL. R. EVID. 801(d)(2)(E).

Since the messages are non-hearsay statements of co-conspirators, they are not testimonial and their admission does not violate the appellant's Sixth Amendment right to confrontation. *See Crawford*, 541 U.S. at 56 ("Most of the hearsay exceptions covered statements that by their nature were not testimo-nial—for example . . . statements in furtherance of a conspiracy."); *Giles v. Cal-ifornia*, 554 U.S. 353, 374 n.6 (2008) (discussing how the co-conspirator excep-tion to hearsay "did not violate the Confrontation Clause" even before *Craw-ford* was decided because "an incriminating statement in furtherance of the conspiracy would probably never be . . . testimonial."). Thus, it was not error, much less plain error, for the military judge to admit the Skype messages.

**D. Failure to State an Offense**

*1. Failure to allege a specific sexual act*

Next, the appellant avers that the specifications alleging that he raped GB fail to state an offense because neither allege an *actus reus*.[31] Specifications 1 and 3 of Charge II state, in pertinent part that the appellant:

> did, at or near New Bern, NC, . . . commit a sexual act upon a child, [GB], who had not attained the age of 12 years.[32]

Specifically, the appellant argues that because the specifications fail to allege the type of sexual act he committed upon GB, they therefore fail to allege an

---

[30] *Id.* at 398.

[31] The appellant argues in his brief that Specifications 1-3 of Charge II each fail to state an offense. *See* Appellant's Brief at 88. Because the appellant was acquitted of Specification 2, our review considers only Specifications 1 and 3 of Charge II.

[32] Charge Sheet.

essential element of the offense, and fail to provide him notice and protection against double jeopardy. We disagree.

We review *de novo* the question of whether the specification states an offense. *United States v. Crafter*, 64 M.J. 209, 210 (C.A.A.F. 2006). Since the appellant did not raise this issue at trial, we review for plain error. *United States v. Ballan*, 71 M.J. 28, 34 (C.A.A.F. 2012); *see also United States v. Sorrells*, No. 201700324, 2019 CCA LEXIS 112, at *6 (N-M. Ct. Crim. App. 13 Mar. 2019) (unpub. op.). The appellant has the "burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right," specifically his right to notice. *United States v. Humphries,* 71 M.J. 209, 214-15 (C.A.A.F. 2012) (quoting *United States v. Girouard,* 70 M.J. 5, 11 (C.A.A.F. 2011)) (internal quotation marks omitted).

The military is a notice pleading jurisdiction. *United States v. Fosler,* 70 M.J. 225, 229 (C.A.A.F. 2011). R.C.M. 307(c)(3) states that a specification must "allege[ ] every element of the charged offense expressly or by necessary implication." A charge is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117 (1974). Therefore, a specification must: (1) allege every element of the charged offense expressly or by necessary implication; and (2) protect the accused from double jeopardy. *Fosler*, 70 M.J. at 229.

The specifications under Charge II alleged violations of Article 120b(a). The text of Article 120b(a) states:

> Any person subject to this chapter who commits a sexual act upon a child who has not attained the age of 12 years . . . is guilty of rape of a child and shall be punished as a court-martial may direct.[33]

For Article 120b, the term "sexual act" is defined by reference to Article 120(g)(1) as either:

> (A) contact between the penis and the vulva or anus or mouth, and for the purposes of this subparagraph contact involving the penis occurs upon penetration, however slight; or

> (B) the penetration, however slight, of the vulva or anus or mouth of another by any part of the body or by any object, with

---

[33] 10 U.S.C. § 920b(a).

> an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person.[34]

We are satisfied that the specifications allege, either expressly or by implication, every element of rape of a child, and therefore state offenses. By alleging that the appellant committed "a sexual act upon" his son, Specifications 1 and 3 of Charge II necessarily imported the definition of "sexual act" from Article 120(g), UCMJ, and put the appellant on notice that the government was required to prove that the appellant's conduct comported with the statutory definition. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 105-07 (2007) (reversing lower court ruling which dismissed an indictment for attempting to enter the country illegally because it failed to allege a specific "overt act" and explaining that an "overt act" is and has been necessary to and part of the definition of an "attempt"). By alleging that the appellant did "commit a sexual act upon" GB, the government placed the appellant on notice that they had merely to prove one of the several different types of sexual acts defined in Article 120(g), UCMJ, and that the appellant, therefore, needed to defend against all the various theories of liability—which is precisely what he did at trial. Finally, under any theory of liability or method of committing the crime, each specification remains but a single offense and provides ample protection against double jeopardy. *See United States v. Shermot*, 77 M.J. 742, at *9 (C.G. Ct. Crim. App. 2018), *rev. denied* 2018 CAAF LEXIS 559 (C.A.A.F., Aug. 22, 2018).

Moreover, the appellant fails to cite a single case holding that a charge or specification alleging rape of a child under Article 120b, UCMJ, must describe the specific type of sexual act to be found sufficient. An error is not plain if it requires this court to extend established precedent. *United States v. Mitchell*, 77 M.J. 725, 735 (N-M. Ct. Crim. App. 2018) (citing *United States v. Nieto*, 66 M.J. 146, 151 (C.A.A.F. 2008) (Stucky, J., concurring) (error not plain if the theory requires "the extension of precedent.") (citation omitted)). With no binding or persuasive authority holding that the specific underlying conduct must be explicitly pleaded in the specification, any claimed error is neither clear nor obvious.

Regardless, even were we to find plain error, the appellant is entitled to a remedy only if he can show prejudice to a substantial right. *See Ballan*, 71 M.J. at 35. "An error in charging an offense is not subject to automatic dismissal, even though it affects constitutional rights." *United States v. Wilkins*, 71 M.J. 410, 413 (C.A.A.F. 2012) (citing *Humphries*, 71 M.J. at 212). Because the appellant did not object at trial, he bears the burden of proving prejudice and

---

[34] *Id.* at § 920(g)(1).

must show "that under the totality of the circumstances in this case, the Government's error . . . resulted in material prejudice to his substantial, constitutional right to notice." *Id.* at 413 (alterations, citation, and internal quotation marks omitted). Here, the appellant fails to do so because he cannot establish prejudice to his ability to defend against the charge he was convicted of or his right to notice.

In *Wilkins*, the CAAF held that an appellant failed to show prejudice from a plain charging error because his defense theory would not have changed had the error not been present. *Id.* at 414-15. Here, the appellant's defense did not focus on which particular conduct he was charged with committing upon GB. He never requested a bill of particulars pursuant to R.C.M. 906(b)(6) or moved for a finding of not guilty under R.C.M. 917. Rather, the appellant's defense was that he did not commit *any* sexual act with GB and that the Skype messages with "Hailey Burtnett" reflected fantasy role play using GB's green teddy bear. Therefore, even if the government had alleged the specific conduct described in the texts, we are unconvinced that the appellant's trial strategy would have changed.

In addition, when a specification is defective because it fails to allege an essential element, "we look to the record to determine whether notice of the missing element is somewhere extant in the trial record." *Humphries*, 71 M.J. at 215-16. Here, the record conclusively demonstrates that the appellant was on notice of the specific acts underlying the charged specifications. The appellant was aware of every substantive piece of evidence the government presented to the members, including the complete exchange of Skype text messages between himself and "Hailey Burtnett" and the results of both his and GB's gonorrhea tests.

Finally, the military judge properly instructed the members on the definition of "sexual act," incorporating the various theories of liability.[35] The members returned general verdicts of guilty to two of the three specifications alleging that the appellant raped GB. The CAAF has explained that general verdicts are allowed when multiple theories of liability are alleged:

> [A] court-martial panel, like a civilian jury, returns a general verdict and does not specify how the law applies to the facts, nor does the panel otherwise explain the reasons for its decision to

---

[35] *See* Record at 854; AE XCIII at 7 ("'Sexual act' means the penetration, however slight, of the vulva or anus or mouth by the penis. 'Sexual act' also means the penetration of another by any part of the body or by any object with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person.").

convict or acquit. In returning such a general verdict, a court-martial panel resolves the issue presented to it: did the accused commit the offense charged . . . beyond a reasonable doubt? A factfinder may enter a general verdict of guilt even when the charge could have been committed by two or more means, as long as the evidence supports at least one of the means beyond a reasonable doubt.

*United States v. Brown*, 65 M.J. 356, 359 (C.A.A.F. 2007) (citations and internal quotation marks omitted); *see also Schad v. Arizona*, 501 U.S. 624, 631 (1991) (plurality opinion) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone."). Consequently, we conclude that even if Specifications 1 and 3 of Charge II failed to allege an essential element, the record demonstrates that the appellant had notice of the Specifications and cannot, therefore, demonstrate material prejudice to a substantial right.

### 2. Ineffective assistance of counsel

The appellant alleges that his trial defense team provided ineffective assistance because they failed to either file a motion for a finding of not guilty or to object in any way to the alleged failure of Specifications 1 and 3 of Charge II to state an offense. We analyze ineffective assistance of counsel claims under the test outlined by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prove ineffective assistance of counsel, the appellant must show that his trial defense team's performance was deficient and that the deficiency deprived him of a fair trial. *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004). "When reviewing ineffectiveness claims, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant.' Rather, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.'" *United States v. Datavs*, 71 M.J. 420, 424-25 (C.A.A.F. 2012) (alteration in original) (internal citation omitted) (quoting *Strickland*, 466 U.S. at 697).

With respect to *Strickland's* prejudice prong, when an allegation of ineffective assistance of counsel is based on a failure to make a motion, the appellant "must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (citation and internal quotation marks omitted); *see also United States v. Flack*, 47 M.J. 415, 417 (C.A.A.F. 1998) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)). Because we have concluded that Specifications 1 and 3 of Charge II did allege all essential elements of the offense of rape of a child,

any motion for relief filed by the appellant's trial defense team would not have been meritorious. Therefore, the appellant suffered no prejudice.

## E. Legal and Factual Sufficiency

We review questions of legal and factual sufficiency *de novo*. Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (citation, internal quotation marks, and emphasis omitted). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001). "The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297-98, (C.A.A.F. 2018) (quoting *Rosario*, 76 M.J. at 117).

### 1. Sexual acts

The appellant challenges the factual sufficiency of his convictions for child rape, conspiracy to commit child rape, and making a false official statement—denying that he raped GB. The appellant argues that the government failed to prove beyond a reasonable doubt that he committed a sexual act upon GB for two reasons: (1) the Skype messages with "Hailey Burtnett" simply reflect fantasies; and (2) GB's positive Diatherix test result was unreliable and could not corroborate that any sexual acts occurred. We disagree.

The appellant was convicted of raping GB on 29 March 2016 and again on 15 May 2016. The graphic Skype conversations between the appellant and "Hailey Burtnett" on those two days reflect a real-time narration of the appellant's crimes.[36] On 29 March, "Hailey Burtnett" initiates the Skype session

---

[36] *See* PE 5; PE 9; and PE 12. PE 5 is the chat log retrieved from the Microsoft Company detailing the Skype user names, content, and dates and times of the Skype text messages between "Hailey Burtnett" and the appellant. Record at 582-83. PE 9 contains the screen shots of the Skype conversation taken from the appellant's cell

with the appellant and asks to see GB before asking the appellant if he was "in the mood."[37] The conversation quickly turns to GB, with "Hailey Burtnett" directing the appellant to perform various sexual activities on his son, beginning with kissing GB and then removing his diaper, and progressing to the appellant performing fellatio on GB, rubbing lotion on GB's penis and buttocks, and then penetrating GB's anus with his finger and penis.[38] The text messages make clear that "Hailey Burtnett" is responding to what she is seeing. On several occasions after she directs the appellant to perform a specific sexual act or to move his camera into a certain position, "Hailey Burtnett" responds with positive commentary, telling the appellant, "good" or "yes."[39] After she directed the appellant to digitally penetrate GB, "Hailey Burtnett" responded "Ohh yes" and "wow."[40] The appellant's replies also indicate that he is actually performing the sexual acts directed by "Hailey Burtnett." During one portion of the text conversation, the appellant told "Hailey Burtnett" that he "kinda" ejaculated; she responded: "I know . . . but not [all the] way."[41]

The 15 May Skype conversation is similar. After a short exchange of pleasantries, the conversation once again turns to GB, with "Hailey Burtnett" again directing the appellant to kiss GB before asking the appellant to put his penis in GB's mouth. She specifically directs the appellant to "tell him to open his mouth up wider . . . say open it big." [42] "Hailey Burtnett" once again directs the appellant to rub lotion on GB's penis and to perform fellatio on GB. She comments that "he likes it so much."[43]

Further, the appellant's statements during his NCIS interrogation are incredible and demonstrate a consciousness of guilt. Indeed, false statements or explanations "by an accused in explaining an alleged offense may themselves tend to show guilt." *United States v. Colcol*, 16 M.J. 479, 484 (C.M.A. 1983) (citing *Wilson v. United States*, 162 U.S. 613 (1896)). First, the appellant told NCIS agents that "Hailey Burtnett" was someone he knew from his hometown.

---

phone. Record at 570-572. PE 12 is a report containing the text of the Skype conversations prepared by a computer forensic expert that extracted the information from the appellant's phone. Record at 691-94.

[37] PE 5 at 6.

[38] *See* PE 5 at 6-9.

[39] *Id.* at 8.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 23.

[43] *Id.*

Yet NCIS agents checked with local law enforcement and the local schools and could find no record of anyone with her name. A forensic analysis of their Skype chat logs revealed, in fact, that "Hailey Burtnett's" IP address resolved to several locations in Europe—not Clearwater, FL, as the appellant claimed. Next, the appellant told Special Agent CM that he did not touch his son inappropriately and that the Skype messages simply reflect fantasy: that he dressed up his son's green teddy bear in a diaper and "d[id] weird stuff to it."[44] But this assertion is belied by the record. Not only do the Skype messages of 29 March and 15 May fail to ever reference a teddy bear or the teddy bear's name ('Scout'), they also describe in graphic detail the human anatomy of a prepubescent boy. The Skype messages always refer to the appellant's son by name and, when "Hailey Burtnett" asked the appellant if GB was home, the appellant sent her a photograph of his son—not a green teddy bear.[45] Moreover, additional Skype messages between "Hailey Burtnett" and the appellant make clear that the two are talking about GB. Throughout their conversations, "Hailey Burtnett" asks the appellant if GB is home, when he will return, or when she will get to see him next. The appellant's responses, too, reveal that they are talking about GB and not a teddy bear. The appellant tells "Hailey Burtnett" that GB is sleeping, or that he just ate, or that he is with his mother. In short, there is no indication whatsoever that the appellant and "Hailey Burtnett" are talking about a teddy bear. Finally, GB's positive test for gonorrhea—a disease that can only be transmitted through sexual contact—corroborated the Skype messages.

Thus, after weighing the evidence and making allowances for not having personally observed the witnesses, we are convinced beyond reasonable doubt that the appellant committed a sexual act upon GB on 29 March 2016 and again on 15 May 2016 and that his convictions for rape of a child, conspiracy to commit rape of a child, and making a false official statement are, therefore, factually sufficient.

### 2. Production and distribution of child pornography

Finally, the appellant avers that his convictions for producing and distributing child pornography, as well as his conviction for conspiracy to produce and distribute child pornography, are not legally and factually sufficient. The appellant argues that the government presented no evidence that any files containing child pornography were created, manufactured or distributed using the Skype application. In support of his argument, the appellant cites *United States v. Malone*, No. 201000387, 2011 CCA LEXIS 115, at *13-16 (N-M. Ct.

---

[44] AE LXXV at 4.

[45] Record at 721, 739; PE 9 at 107.

Crim. App. 28 June 2011) (unpub. op.), *rev. denied*, 70 M.J. 367 (C.A.A.F. 2011), where we held that "streaming video" was not legally sufficient to prove distribution of child pornography.

The appellant's reliance on *Malone* is misplaced. In *Malone*, we held that a servicemember's conviction for distributing child pornography under 18 U.S.C. § 2252A(a)(2)(A) was not legally sufficient because there was no evidence that Malone delivered child pornography "to the possession of another." *Id.* at *14. There, a fellow Sailor had accessed files on the appellant's computer and viewed them in "streaming video format." Because the Sailor did not possess the videos in any manner, we held that the evidence was legally insufficient to establish distribution.

Unlike *Malone*, the appellant was charged with clause 2, Article 134, UCMJ, offenses for producing and distributing child pornography where the "said conduct was of a nature to bring discredit upon the armed forces."[46] Under Article 36, UCMJ, the President has the authority to issue "[p]retrial, trial, and post-trial procedures, including modes of proof, for cases arising under [the UCMJ] triable in courts-martial . . . ." The MCM is the document through which the President exercises his Article 36 rule-making authority. The President specifically prescribed the elements, modes of proof and corresponding definitions for the appellant's offenses.[47]

Thus, we first look to the elements of the offenses charged and the corresponding definitions prescribed by the President. The elements of producing child pornography as alleged in Specifications 1 and 5 of Charge III are:

> (1) That the appellant knowingly and wrongfully produced child pornography, to wit: a video of a minor engaging in sexually explicit conduct;
>
> (2) That the production was with the intent to distribute; and
>
> (3) That, under the circumstances, the conduct of the appellant was of a nature to bring discredit upon the armed forces.[48]

---

[46] Charge Sheet; *see also* MCM, Part IV, ¶ 60.c.(1) ("Clause 2 offenses involve conduct of a nature to bring to bring discredit upon the armed forces.").

[47] *See* MCM, Part IV, ¶ 68b.b and c. This offense was added to the MCM by Executive Order 13593, signed 13 December 2011, after *Malone* was decided by our court.

[48] *See* 10 U.S.C. § 934 (2012); MCM, Part IV, ¶ 68b.b.(4). Because the appellant was charged with producing *with the intent to distribute*, the second element was added by the military judge. *See* Record at 852-53; AE XCIII at 4, 6.

The elements of distributing child pornography as alleged in Specifications 2 and 6 of Charge III are:

> (1) That the appellant knowingly and wrongfully distributed child pornography, to wit: a video of a minor engaging in sexually explicit conduct; and

> (2) That, under the circumstances, the conduct of the accused was of a nature to bring discredit upon the armed forces.[49]

Child pornography is defined as "material that contains either an obscene *visual depiction* of a minor engaging in sexually explicit conduct or a *visual depiction* of an actual minor engaging in sexually explicit conduct."[50] Distributing simply means "delivering to the actual or constructive possession of another."[51] Possession, in turn, "means exercising control of something" and "may be direct physical custody . . . or it may be constructive."[52] The term producing means "creating or manufacturing"; that is, "making child pornography that did not previously exist."[53]

Finally, the term "visual depiction" as used in the definition of "Child Pornography" includes:

> any developed or undeveloped photograph, picture, film or video; any digital or computer image, picture, film, or video made by any means, *including those transmitted by any means including streaming media, even if not stored in a permanent format*; or any digital or electronic data capable of conversion into a visual image.[54]

The government presented evidence that the appellant committed sexual acts on his two-year-old son while "live streaming" the misconduct to an individual identifying herself as "Hailey Burtnett" via the Skype application on his cell phone. The President specifically defined "child pornography" in terms of a "visual depiction" and that term is further defined to include streaming video. By engaging in "sexually explicit conduct" with his son and transmitting it live

---

[49] 10 U.S.C. § 934 (2012); MCM Part IV, ¶ 68b.b.(3).

[50] MCM, Part IV, ¶ 68b.c.(1) (emphasis added).

[51] *Id.* at ¶ 68b.c.(3).

[52] *Id.* at ¶ 68b.c.(5).

[53] *Id.* at ¶ 68b.c.(6).

[54] *Id.* at ¶ 68b.c.(8) (emphasis added).

via "streaming video," the appellant, therefore, created child pornography that did not previously exist.

Likewise, by engaging in a live communication with "Hailey Burtnett" in which he streamed visual depictions of himself raping GB, while receiving instant message instructions and feedback from Hailey, the appellant delivered child pornography to the constructive possession of another. "Constructive possession" is "[c]ontrol or dominion over a property without actual possession or custody of it."[55] Under the circumstances presented here, we conclude that "Hailey Burtnett" had "control or dominion" over the streaming media because she could end the transmission at any time by closing the Skype application on her phone, tablet, or computer (or by powering off the device); she could take screenshots of the video; or she could use another camera or cell phone to record the video depicted on her screen. In short, once broadcast via live stream, the person in receipt of streaming video has myriad ways to exercise control over the video.

Consequently, after considering the evidence in the light most favorable to the government, we conclude that rational members could have found beyond a reasonable doubt that the appellant wrongfully produced and distributed child pornography and that he conspired to wrongfully produce and distribute child pornography. Moreover, after taking a fresh, impartial look at the evidence, we ourselves are convinced beyond reasonable doubt of the appellant's guilt.

## III. CONCLUSION

After careful consideration of the record of proceedings and the briefs and oral argument of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights occurred. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

Judge TANG and Judge LAWRENCE concur.

---

[55] *Constructive Possession*, BLACK'S LAW DICTIONARY (10th ed. 2014).



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court