# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

### Michael H. SHERMOT
### Cadet, U.S. Coast Guard

**CGCMG 0351**
**Docket No. 1447**

**11 April 2018**

General Court-Martial convened by Superintendent, United States Coast Guard Academy.  Tried at Norfolk, Virginia, 13 May 2016, 12–16 September 2016.

| | |
|---|---|
| Military Judge: | CAPT Gary E. Felicetti, USCG |
| Appellate Defense Counsel: | Mr. John M. Smith, Esq. |
| | LCDR Michael J. Meyer, USCG |
| | CDR Shanell M. King, USCG |
| Appellate Government Counsel: | LT Connor B. Simpson, USCG |
| | LCDR Tereza Z. Ohley, USCG |

### BEFORE
### MCCLELLAND, BRUBAKER & HAMILTON
Appellate Military Judges

BRUBAKER, Judge:

A military judge sitting alone as a general court-martial convicted Appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ).  The military judge sentenced Appellant to confinement for one year and dismissal, which the Convening Authority approved.

Appellant now asserts that: (1) the specification's use of the disjunctive—that Appellant knew *or* reasonably should have known the complaining witness was incapable of consenting— rendered the verdict ambiguous and deprived Appellant of constitutional due process; and (2) the evidence is factually insufficient to sustain his conviction.

We disagree and affirm.

**Facts**

While on liberty from the U. S. Coast Guard Academy, Appellant and a fellow cadet traveled to a college town and attended a house party. A group of people at the party, including Appellant, the fellow cadet, and AD—the complaining witness in this case—left the party and walked to a nearby bar. At the bar, Appellant and AD danced, displayed mutual affection, and appeared to be having a good time. As the night progressed, AD showed increasing signs of intoxication—loss of motor function, difficulty standing on her own, loss of inhibition—and ultimately was asked to leave the bar. Aware of this, Appellant got the attention of another member of the group—LJ—to tell her that AD was "really drunk" and that he wanted to take AD home but did not know where she lived. (R. at 452.) LJ said she did not know either but agreed to help get AD home safely. The fellow cadet and another of Appellant's friends joined.

AD could not find the key to her apartment, so she directed the group to a bar and restaurant along the way to ask one of her roommates, who worked there, for his key. The bouncer at the entrance, noting she was heavily intoxicated, told her there was "no way" she was getting in. (R. at 420.) Slurring her words, grabbing a handrail, and generally making a scene, she started yelling a name, which on the fifth or sixth yell, the bouncer could make out as "Kevin"—AD's roommate and the bouncer's co-worker. Another bouncer who knew AD initially did not recognize her because he had never seen her "like that"—that is, so intoxicated. (R. at 435.) "[H]er words, you could barely understand them. She couldn't stand up straight. She was hunched over, being held up." *Id.* Appellant—the one holding her up—appeared, in contrast, "perfectly fine." *Id.*

AD's roommate Kevin also described AD as "very intoxicated" and unable to stand without Appellant's assistance. "Her eyes were rolling around in her head, extremely bloodshot, her speech was very slurred, very slow, her body language, her arms are very flamboyant, kind of like jello . . . . just flying all over the place." (R. at 283.) Kevin gave AD the key but expressed that he expected the others to return it to him after getting AD into the apartment.

Once in the apartment, LJ witnessed AD vomit a small amount on the living room carpet. Appellant, who had been sitting by AD's side, then helped AD up a flight of stairs toward her bedroom and a bathroom. After it had seemed a while to LJ, she went upstairs to check on

2

Appellant and AD.  She found AD in the bathroom kneeling in front of the toilet, resting her head on the toilet with Appellant standing behind her.  LJ offered AD a hair tie, but as AD appeared unable to pull her own hair back, LJ did it for her.  Noting that AD appeared to be struggling to maintain consciousness, LJ asked Appellant to assist her in getting AD to her bedroom.

In the bedroom, Appellant and LJ laid AD on the bed over the sheets.  LJ removed AD's shoes and bracelets, then told Appellant that she needed to use the bathroom and would be right back.  When she returned, the bedroom door was closed and locked and the lights were off.  Confused and unfamiliar with whether Appellant and AD were in a romantic relationship, LJ returned downstairs and ultimately left with the others.

Meanwhile, Kevin became concerned that the others had not come back to return the key and got permission to leave work to check on AD.   Once inside the apartment, he heard a sound like "pumping against the wall." (R. at 289.)  He knocked on the door, got no response, then tried the knob, but it was locked.  He continued to call AD's name without getting a response, so he got an angle where he could see into the room through a small gap in a curtain on the inside of the glass-paneled door.  He saw AD lying on her bed, limp, naked, with eyes closed.  Kevin called out her name, again to no avail, so he continued to look around the room and saw Appellant attempting to hide and covering himself with a blanket.  Kevin repeatedly yelled for Appellant to come to the door until finally, Appellant threw down what turned out to be a used condom and opened the door.  Kevin ran in, asking "why, why are you with her, I told you to come back." (R. at 291.)  Appellant responded, "I'm sorry, I'm sorry, it was consensual, she consented, she wanted it." (*Id.*)

Throughout this confrontation, AD remained limp, eyes closed, unresponsive.

### Use of the Disjunctive in the Specification

We first consider whether the use of the disjunctive in the specification thwarts our ability to review for factual sufficiency or is otherwise fatal.  The specification of which Appellant was charged and convicted averred that at a specified date and location, he committed a sexual act upon AD when she was incapable of consenting due to impairment by an intoxicant, "and that condition was known, *or* reasonably should have been known," by Appellant.  (Charge

Sheet (emphasis added).) For the first time on appeal, Appellant asserts this use of the disjunctive requires his conviction to be overturned for two reasons.

First, in his assignment of error, Appellant asserts, "Article 120(b)(3)(A) is unconstitutional as applied because it allowed the government to require [Appellant] to defend against two separate and distinct *mens rea*: actual knowledge (knows) and negligence (reasonably should have known), a violation of due process." (Appellant's Brief at 17.) His brief clarifies that the purported unconstitutionality stems from a lack of notice as to which theory of liability he was defending against and a lack of protection from double jeopardy. This is more appropriately addressed as a question of the sufficiency of the specification to provide constitutional notice and protection against double jeopardy than the constitutionality of the statute itself as applied.

We review the sufficiency of a specification *de novo*. *United States v. Humphries*, 71 M.J. 209, 212 (C.A.A.F. 2012). An appellant who alleges a defective specification for the first time on appeal, however, forfeits the issue unless he can show plain error, that is: (1) that there was error; (2) that the error was plain or obvious; and (3) that the error materially prejudiced a substantial right of his. *Id.* at 213–214.

The military is a notice-pleading jurisdiction. *United States v. Sell*, 11 C.M.R. 202, 206 (C.M.A. 1953). A specification is sufficient if it: (1) alleges every element of the charged offense expressly or by necessary implication; and (2) protects the accused from double jeopardy. *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011); *see also Hamling v. United States*, 418 U.S. 87, 117 (1974).

The charged offense—sexual assault under Article 120(b)(1)(3)(A), UCMJ—requires the government to prove: (1) that the accused committed a sexual act upon another person; (2) that the other person was incapable of consenting to the sexual act due to impairment by an intoxicant; and (3) that the accused knew or reasonably should have known that the other person was incapable of consenting. Article 120(b)(1)(3)(A), UCMJ. The crux here is whether the phrase "knew or reasonably should have known" reflects distinct alternative *elements* or alternative *theories of liability* for the same offense. Elements must be pleaded and proved distinctly; alternative theories of liability, which are simply different ways to commit the same

4

offense, need not. *Schad v. Arizona*, 501 U.S. 624, 631 (1991) (plurality opinion) ("We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone.").

We hold that the phrase "knew or reasonably should have known" reflects not distinct elements, but alternative theories of liability. They represent two possible means of possessing the statutorily-defined *mens rea* to establish criminality. *Cf. United States v. Sager*, 76 M.J. 158, 162 (C.A.A.F. 2017) (holding that statutory prohibition of abusive sexual contact while the victim was "asleep, unconscious, or otherwise unaware" reflected separate theories of liability); *see also Sager,* 76 M.J. at 163 (Stucky, J., dissenting) (opining that the military judge erred by instructing members to choose between "one of two theories of guilt: that Appellant: (1) knew or (2) reasonably should have known that the victim was unaware the sexual contact was occurring. . . . In my opinion, the court members did not have to decide between the two theories . . . . Two-thirds of the members just had to agree that he knew or reasonably should have known."). As such, the government only had to prove one or the other and it made no difference which one the fact-finder chose as long as there was "evidence sufficient to justify a finding of guilty on any theory of liability submitted to the [fact-finder]." *United States v. Brown*, 65 M.J. 356, 359 (C.A.A.F. 2007) (quoting *United States v. Vidal*, 23 M.J. 319, 325 (C.M.A. 1987)).

The specification here expressly alleged all three elements of the offense. By alleging that Appellant knew or reasonably should have known AD's condition, it placed him on notice that the government merely had to prove one of those theories of liability and that Appellant therefore needed to defend against each—which is precisely what he did at trial. Finally, because under either theory of liability, it is but one offense, the specification provides ample protection against double jeopardy. It is therefore sufficient and Appellant has failed to establish error, plain or otherwise.

Second, in his reply brief, Appellant, citing *United States v. Walters*, 58 M.J. 391 (C.A.A.F. 2003), posits his verdict is ambiguous because we, in conducting our factual sufficiency review under Article 66(c), UCMJ, cannot ascertain under which *mens rea* the military judge convicted Appellant. But *Walters* is inapposite here. That case presented "a

narrow circumstance involving the conversion of a 'divers occasions' specification to a 'one occasion' specification through exceptions and substitutions." *Walters*, 58 M.J. at 396. Here, in contrast, Appellant was charged and convicted of a single occasion of sexual assault at a specified time and place.

Under these circumstances, even a general verdict masking which theory of liability the fact-finder selected to convict Appellant would not frustrate our review. *See Brown*, 65 M.J. at 358. But we do not have a general verdict here. The military judge entered special findings under Article 51(d), UCMJ and Rule for Courts-Martial 918(b), Manual for Courts-Martial, United States (2012 ed.), expressly finding beyond a reasonable doubt that AD was incapable of consenting, that Appellant was in a position to fully observe her condition, and that a reasonable, sober adult would have known she was incapable of consenting—that is, that Appellant reasonably should have known AD was incapable of consenting. There is nothing ambiguous about the verdict and again, Appellant has failed to establish error, plain or otherwise.[1]

### Factual Sufficiency

Appellant asserts that the evidence was factually insufficient to prove that at the time Appellant penetrated AD's vagina with his penis—which was not in dispute below or before us—AD was incapable of consenting and Appellant knew or reasonably should have known this. Reviewing *de novo*, *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002), and having weighed the evidence in the record of trial and making allowances for not having personally observed the witnesses, *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017), we disagree.

The record in this case includes the military judge's special findings. We consider special findings as part of the record in making our factual sufficiency determination, but we otherwise apply no special standard to them. *United States v. Clark*, 75 M.J. 298, 300 (C.A.A.F. 2016). Instead, we review the record, including any special findings, *de novo* to determine whether we are independently convinced of Appellant's guilt beyond a reasonable doubt. *Id.*; *Washington*, 57 M.J. at 399.

---

[11] Appellant also cites *United States v. Honea*, 77 M.J. 181 (C.A.A.F. 2018), for the proposition that proper appellate review requires that the record adequately demonstrate the charge of which Appellant was convicted. *Id.* at 182. But the facts in this case present nothing akin to "[t]he tortuous procedural facts" and "tangled morass" of *Honea*. *Id*. at 182, 184.

We are convinced. First, we find overwhelming evidence that AD was incapable of consenting, which means "lack[ing] the cognitive ability to appreciate the sexual conduct in question or [lacking] the physical or mental ability to make [or] to communicate a decision about whether they agreed to the conduct." *United States v. Pease*, 75 M.J. 180, 185–186 (C.A.A.F. 2016) (first two alterations in original). AD suffered fragmentary blackout, remembering events of the evening only in flashes. She remembered asking for and meeting with Kevin, not being sure who she was with, someone helping her walk, then being in her apartment and being helped up the stairs. The next memory she had was "kind of barely waking up" and noticing she was naked on her bed with someone on top of her with his penis in her vagina. AD expressed that she did not know who it was, did not "really have the ability to move or anything" and immediately lapsed back into unconsciousness. (R. at 522–23).

Unlike *Pease*, the government was able to present testimony from several witnesses to provide further powerful evidence that AD was incapable of consenting due to impairment by alcohol. Particularly compelling were LJ and Kevin. LJ had just met Appellant, AD, and the others who were present in the apartment; she had no apparent bias. She provided details of AD's increasing impairment, including the image of AD crouched in front of the toilet moments before the assault, incoherent, unable to tie her own hair back, and lapsing in and out of consciousness. Kevin was AD's friend and roommate, but had no romantic relationship with her; he too had no apparent motive to exaggerate or fabricate. His testimony describing AD's level of intoxication before and immediately after the assault was vivid, credible, and powerful.

Medical evidence buttressed this testimony. Consistent with the difficulty Kevin had rousing AD following the assault, a responding emergency medical technician had to resort to pain stimulus to rouse her back into consciousness. She described AD as confused, not oriented to the situation, and repeatedly asking what was happening. The triage nurse at the emergency room also noted that rousing AD required yelling or painful stimuli and that she was otherwise "pretty much unresponsive." (R. at 577–78). A forensic toxicologist estimated, based on blood drawn at the hospital, that AD's blood alcohol content at the time of the assault was in the range of 0.199 to 0.244%.

We also find that the evidence amply supports the military judge's special finding that Appellant reasonably should have known that AD was incapable of consenting. It was, after all,

Appellant who informed others that AD was drunk and needed assistance getting home; was by her side as she was denied entrance to another establishment due to her manifest intoxication; helped her remain upright as he aided her getting back home; rose from the couch ostensibly to help her after she had, as reported by LJ, vomited a small amount onto the carpet; stood behind AD as she knelt in front of the toilet struggling to maintain consciousness; helped, along with LJ, AD to her bed as LJ removed AD's shoes and jewelry; closed and locked the door as soon as LJ departed. AD became manifestly more impaired as the evening wore on. We have little hesitation concluding that even if Appellant was oblivious to these cues and believed AD capable of consenting when he engaged in a sexual act with her, he reasonably should have known she was not.

We have carefully considered evidence Appellant highlights as contradictory, including his own testimony and evidence that AD's DNA was present on both sides of the condom recovered from her bedroom. But having weighed that and all evidence presented, we are convinced of Appellant's guilt beyond a reasonable doubt. We thus find the evidence factually sufficient.

### Decision

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the findings and sentence are determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Chief Judge MCCLELLAND and Judge HAMILTON concur.



For the Court,

Sarah P. Valdes
Clerk of the Court