*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HACKEL, GROSS, and BLOSSER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Emerson T. OVANDO**
Damage Controlman Third Class (E-4), U.S. Navy
*Appellant*

**No. 202200236**

_____

Decided: 9 February 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Benjamin C. Robinson

Sentence adjudged 24 June 2022 by a general court-martial convened at Fleet Activities, Yokosuka, Japan consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to E-1, confinement for three years and six months, and a dishonorable discharge.

For Appellant:
*Lieutenant Christopher B. Dempsey, JAGC, USN*


For Appellee:
*Major Candace G. White, USMC*
*Lieutenant R. Blake Royall, JAGC, USN*

Judge BLOSSER delivered the opinion of the Court, in which Senior Judge HACKEL and Judge GROSS joined.

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

———————————————

BLOSSER, Judge:

A general court-martial convicted Appellant, contrary to his pleas, of two specifications of sexual assault and one specification of abusive sexual contact, in violation of Article 120, Uniform Code of Military Justice [UCMJ].[1]

Appellant asserts five assignments of error [AOE]: (1) the evidence is factually insufficient to sustain Appellant's convictions; (2) Appellant was harmed by unreasonable post-trial delay; (3) Appellant was deprived of his right to a unanimous verdict; (4) trial counsel delivered an improper closing argument; and (5) the military judge abused his discretion by preventing trial defense counsel from presenting a PowerPoint presentation during closing argument.[2] We find no prejudicial error and affirm.

## I. BACKGROUND

On the night of 11 July 2020, Appellant attended a party in Petty Officer Third Class Scott Mike's barracks room where he and others consumed alcohol.[3] At the same time, Petty Officer Third Class Megan Bravo [the Victim] was socializing with friends in Petty Officer Second Class Andrew Howard's

---

[1] 10 U.S.C. § 920.

[2] Appellant's third, fourth, and fifth AOEs are raised pursuant to *United States v. Grostefon*, 12 C.M.A. 431 (C.M.A. 1982). We have reviewed Appellant's third and fifth AOEs and find them to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987). We note our superior court resolved the unanimous verdict issue in *United States v. Anderson*, 83 M.J. 291 (C.A.A.F. 2023), three days after Appellant filed his brief. We also appreciate Appellate Defense Counsel acknowledging the Record does not support the fifth AOE. Appellant's Supp. Br. at 6.

[3] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

barracks room.[4] While there, the Victim consumed tequila, whiskey, rum, and other alcohol in mixed drinks from 2100 until sometime between 2300 and midnight. The Victim testified she drank somewhere between one-quarter and one-half of bottle of premixed margarita, and that she added additional tequila to it.[5]

Between 2300 and midnight, the Victim decided to go to Petty Officer Mike's room; Petty Officer Howard escorted her. She had difficulty walking and required assistance to avoid falling on the floor. Her speech was very slurred and she could not form coherent sentences. Petty Officer Mike assisted her to his restroom and sat her in front of the toilet where she vomited between two and five times. Approximately 30 minutes after the Victim arrived at Petty Officer Mike's room, he and another Sailor, Petty Officer Carol Golf, guided her from the toilet to the bathtub.[6]

Around 0100 on 12 July 2020, Petty Officer Mike used his cellular phone to record a video of the Victim. The video is 10 seconds long and shows the Victim in an empty bathtub wearing shorts and a t-shirt.[7] Her head is rolling around and her eyes are closed. Petty Officer Mike turns her over by pushing her right shoulder then touches the right side of her head and says, "Hey."[8] The Victim's head continues rolling around and she does not respond immediately. After four seconds, her eyes open slightly, she clumsily reaches her left hand out in the direction of the camera lens, and says, "go."[9]

Five minutes later, Petty Officer Mike recorded a second video of the Victim.[10] The second video is nine seconds long and shows her in the same position in the bathtub but her t-shirt has been removed and her head is resting on a pillow. She moves her left hand in a loose pattern and says, "zee" two times while laughing. Her eyes are still only slightly open and she appears unable to form a complete sentence.

---

[4] R. at 847–48, 856.

[5] R. at 848, 871–76. The bottle was 1.75 liters and contained 9.95% alcohol by volume. Def. Ex. A.

[6] R. at 770.

[7] Pros. Ex. 1.

[8] *Id.*

[9] After reviewing the video, we disagree with Appellant's assertion that the Victim responded with "no." *Compare* Pros. Ex. 1 *with* Appellant's Br. at 5, 31; Appellant's Reply Br. at 5.

[10] R. at 775–76; Pros. Ex. 2.

Petty Officer Mike and Petty Officer Golf sat on the floor next to the bathtub to ensure the Victim was okay. She eventually fell asleep. Appellant asked to use the restroom approximately 30 minutes after Petty Officer Mike recorded the second video.[11] According to Petty Officer Golf, the Victim was wearing the bra and shorts seen in the second video, and appeared to be asleep. Petty Officer Mike placed a blanket on top of the Victim and either he or Petty Officer Golf closed the bathtub curtain before they both stepped out of the restroom, leaving the door cracked. While Appellant was in the restroom, Petty Officer Mike and Petty Officer Golf heard Appellant urinating, the toilet flushing, and the sink running. Appellant left the restroom after approximately five minutes and Petty Officer Golf opened the bathtub curtain to check on the Victim, who was in the same position and condition as before. According to Petty Officer Golf, the Victim "appeared to be unconscious … her eyes were shut, she was breathing steadily, she wasn't moving at all."[12]

Between 30 and 60 minutes later, Appellant asked to use the restroom a second time.[13] Before leaving the restroom, Petty Officer Mike and Petty Officer Golf did the same as the first time—ensured the Victim was covered with a blanket, closed the bathtub curtain, stepped out of the restroom, and left the door cracked. Petty Officer Golf noted that the Victim "still appeared to be unconscious, nothing changed."[14]

This time, while Appellant was in the restroom, Petty Officer Mike and Petty Officer Golf heard nothing—no urinating, no toilet flushing, no sink running. After somewhere between 5 and 10 minutes, Petty Officer Mike went to the restroom to check on the Victim. When he opened the door from its cracked state, Petty Officer Mike saw the bathtub curtain opened fully and Appellant in the bathtub with the Victim. The blanket had been removed. Appellant's torso was between the Victim's spread legs with her shorts at her ankles. Although Petty Officer Mike did not observe any contact between Appellant's mouth and the Victim's vagina, it appeared to him that Appellant had been performing oral sex on her. Petty Officer Mike began yelling at Appellant and kicked him out of his room.

When Petty Officer Mike began yelling, Petty Officer Golf quickly entered the restroom and saw Appellant on his knees in the bathtub, sitting straight

---

[11] R. at 776–77.

[12] R. at 934.

[13] R. at 778, 791.

[14] R. at 935.

up between the Victim's legs. Appellant's shorts were at his knees and his flaccid penis was exposed. According to Petty Officer Golf, it did not appear the Victim was moving.[15] Once Petty Officer Mike got Appellant out of the restroom, Petty Officer Golf observed the Victim "stirring, like kind of waking up. [The Victim] was opening her eyes and kind of shifting and moving and steadying herself like on the bathtub wall . . . as she sat up and went to go stand up, kind of holding on to the shower walls to do so."[16] The Victim's shorts were off, on the bathtub floor, and wet from Appellant unintentionally turning the faucet on while getting out of the bathtub. The Victim indicated to Petty Officer Golf she did not want to be touched. Petty Officer Golf asked the Victim if she wanted to borrow her extra pants and the Victim said, "[Y]es."[17] The Victim was unsteady and sluggish, but put the pants on by herself. Using objects and walls for support along her way, the Victim got out of the bathtub, walked to the couch, and sat down.

Despite numerous memory gaps, the Victim remembered physical sensations: being wrapped in the blanket, her chest and hands being pinned down, a hand penetrating her vagina, and lips on her breasts and stomach.[18] She had no "visual memories" between vomiting in the toilet and Petty Officer Mike removing Appellant from the bathtub.[19] She had no memory of Appellant performing oral sex on her.

During the Naval Criminal Investigative Service [NCIS] investigation, Appellant provided a handwritten statement, answered an agent's questions during an interview, and wrote an apology letter to the Victim. According to his handwritten statement, Appellant was intoxicated when the Victim entered Petty Officer Mike's room, but knew she was "drunk."[20] Appellant asserted, "An hour or two went by and she came into her senses, she was laughing and talking and she was able to somewhat stand up on her own. [Petty Officer Mike] decided it was best to put her in the bathroom tub."[21] According to Appellant, while he was urinating the second time, the Victim was talking to him,

---

[15] R. at 937.

[16] R. at 937–38.

[17] R. at 938.

[18] R. at 850–51, 860.

[19] R. at 850–51.

[20] Pros. Ex. 6 at 1; Pros. Ex. 8 at 1.

[21] Pros. Ex. 6 at 1; Pros. Ex. 8 at 1–2.

saying, "[H]ey baby, come over here" before asking for a kiss.[22] Then, while they were kissing, the Victim said, "to do more" and Appellant began "sucking her nipples."[23] He claimed she said he could "do more stuff to her," so he took her shorts off and began to perform oral sex on her.[24]

During his NCIS interview, the agent asked Appellant how much of the time the Victim was "unaware of what was going on, when she was unconscious" during the sexual activity.[25] Appellant admitted she was unaware for three minutes. During this time, "She was just lying there."[26] Appellant later claimed the Victim was brushing his hair, but admitted he could tell "she wasn't there" during those three minutes.[27] Appellant responded in the affirmative when the agent clarified that for "three minutes during that encounter that she was just blacked out, she didn't know what was going on."[28] During the interview, the agent drafted a written timeline of the events in the restroom. Appellant signed the timeline, indicating he had "verified [it] for accuracy."[29] The timeline states, "last 3 minutes unconscious – performing oral sex."[30]

At the conclusion his NCIS interview, Appellant wrote a "Letter of Apology" to the Victim. In it, Appellant wrote, "I remember seeing you come in the room, [Petty Officer Mike] was carrying you because you weren't able to stand up on your own."[31] Appellant admitted that he kissed the Victim, sucked on her nipples, took off her shorts, and performed oral sex on her. As in his written statement and NCIS interview, he claimed she asked him to do so. He then admitted that he "realized that [the Victim] went unconscious the last three minutes

---

[22] Prox. Ex. 6 at 1; Pros. Ex. 8 at 2.

[23] Pros. Ex. 6 at 2; Pros. Ex. 8 at 2.

[24] *Id.*

[25] App. Ex. LXXXVIII at 103.

[26] *Id.*

[27] App. Ex. LXXXVIII at 104.

[28] *Id.*

[29] Pros. Ex. 11.

[30] *Id.*

[31] Pros. Ex. 12 at 2.

before [Petty Officer Mike] barged in."[32] Appellant wrote, "I never saw you push me away or close your legs and I thought it was okay, but it wasn't."[33]

Additional facts necessary to resolve specific Assignments of Error are discussed below.

## II. DISCUSSION

### A. The evidence is factually sufficient to support Appellant's convictions.

Appellant contends the evidence is factually insufficient to prove that the Victim was incapable of consenting and that Appellant reasonably should have known the Victim was incapable of consenting.

#### 1. Law

We review factual sufficiency de novo.[34] The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are convinced of an appellant's guilt beyond a reasonable doubt.[35] We do not presume either innocence or guilt, and instead take "a fresh, impartial look at the evidence" to independently determine whether each element has been satisfied with proof beyond a reasonable doubt.[36] Proof beyond a reasonable doubt "does not mean the evidence must be free from conflict."[37]

To prove Appellant committed a sexual assault upon the Victim, the Government was required to show that: 1) Appellant committed a sexual act upon the Victim; 2) the Victim was incapable of consenting to the sexual act due to impairment by an intoxicant—alcohol; and 3) Appellant reasonably should have known the Victim was incapable of consenting. To prove Appellant com-

---

[32] Pros. Ex. 12 at 3.

[33] *Id.*

[34] Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2019); *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

[35] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *see also* Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2017) ("In considering the record, the Court may weigh the evidence, judge the credibility of witness, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.")

[36] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[37] *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

mitted an abusive sexual contact upon the Victim, the Government was required to show the same elements, substituting "sexual contact" for "sexual act." Appellant does not challenge the first element for either offense, focusing his argument only on the second and third elements.

"'[C]onsent' means a freely given agreement to the conduct at issue by a competent person."[38] To prove the Victim was "incapable of consenting," the Government was required to show that she was "incapable of apprising the nature of the conduct at issue" or "physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act [or contact] at issue."[39] "[A] person can be awake and conscious and still be incapable of consenting."[40]

### 2. Discussion

a. The Evidence is Factually Sufficient to Show the Victim was Incapable of Consenting.

The record reveals ample evidence of the Victim's severe level of intoxication causing her to be incapable of consenting to a sexual act or sexual contact. She consumed a large amount of alcohol over a two hour period in Petty Officer Howard's room and then had difficulty walking, ran into the walls, and fell on the ground while going to Petty Officer Mike's room. When she arrived at Petty Officer Mike's room around midnight, she took two or three steps through the door, stumbled, and collapsed. Appellant, himself, described her as unable to stand on her own.[41] The Victim's speech and sentence formation were impaired. She required assistance going to the restroom and vomited upwards of five times. The videos, taken at 0100 and 0105 (between one and two hours before the sexual encounter), show the Victim highly intoxicated, incoherent, and lacking much motor control.

Petty Officer Mike and Petty Officer Golf described the Victim's observable state as largely unchanged just prior to the sexual encounter.[42] Immediately after the sexual encounter, the Victim "seemed to be in a state of shock . . . was very scared, very confused, didn't know what happened."[43] She was "still very

---

[38] Article 120(g)(7)(A), UCMJ, 10 U.S.C. § 920(g)(7)(A).

[39] Article 120(g)(8), UCMJ, 10 U.S.C. § 920(g)(8).

[40] *United States v. Bailey*, 77 M.J. 11, 14 (C.A.A.F. 2017).

[41] Pros. Ex. 12 at 2.

[42] R. at 784, 828, 830, 935.

[43] R. at 784.

loopy, very drowsy."[44] She did not appear to be moving.[45] When Petty Officer Golf approached her and got down to her level, the Victim was opening her eyes and appeared to be stirring and waking up. The Victim subsequently responded to Petty Officer Golf's questions with simple, one-word answers. Additionally, although she was able to stand up, put pants on, and move to the couch on her own power, she had to use walls and other objects to steady herself while doing so.

In an attempt to support the argument that the evidence was insufficient to support Appellant's convictions, Appellate Defense Counsel mischaracterizes the overall testimony of the Government's forensic psychiatrist, Dr. Jones, writing in Appellant's brief that Dr. Jones "comparatively testified [the Victim] was easily aroused[46] throughout the night regardless of her intoxication."[47] This characterization of Dr. Jones' testimony appears to come from two cross examination questions and Dr. Jones' corresponding answers. However, nothing in the record—including the portion cited by Appellate Defense Counsel—suggests that the Victim was "easily aroused." Rather, the thrust of Dr. Jones' testimony was that the Victim had "a highly sedated state of mind, an altered consciousness, a tendency to fall asleep and marked slowness in responding to stimuli."[48] Dr. Jones also opined that the Victim's use of simple, one-word utterances both before and after the assault demonstrated she had an impaired ability to communicate.[49]

---

[44] R. at 828

[45] R. at 934, 937.

[46] The terms "aroused" and "arousal" in this opinion are unrelated to sexual excitement. We interpret counsel's use of "aroused" here as synonymous with "rouse," meaning to awaken from sleep and to increase the person's responsiveness to sensory stimuli.

[47] Appellant's Reply Br. at 3.

[48] R. at 972.

[49] R. at 981–82.

Appellant argues that the facts in this case are analogous to our prior cases of *United States v. Pease*[50] and *United States v. Lewis.*[51] We disagree. This case is easily distinguishable. In *Pease*, this Court identified problematic evidence about the complainants' degree of impairment, including eyewitness testimony that "largely minimized their level of intoxication."[52] Here, there was no dispute among the eyewitnesses about the Victim's level of intoxication. In *Pease*, testimony described one complainant's ability to walk "without any apparent difficulty, navigate the gate and ladder well, request permission to come aboard, and scan her identification card."[53] Here, testimony indicated the Victim had great difficulty walking—navigating from the bathtub to the couch required her to hold onto the wall and other objects for support. In *Pease*, one of the complainants had fragmentary memories of kissing the appellant and telling him he was cute, and "conceded in cross-examination that she may have said 'yes' to the sexual intercourse, and just could not remember doing so."[54] Here, there was no testimony or other credible evidence that the Victim may have consented. Finally, in *Pease*, the second complainant had more significant memory gaps than the first, but "remembered that when certain activities were painful or unpleasant, she was able to determine that she did not want that activity to continue and to articulate that to the appellant, who stopped."[55] That complainant also admitted to active participation in portions of the sexual activity. Here, the Victim testified she was unable to move or talk during the sexual encounter.

Similarly, we disagree with Appellant's assertion that this case is analogous to *Lewis*. In *Lewis*, the complainant testified about various sexual actions by the appellant and her repeated actions to physically communicate an unwillingness to participate. For example, the complainant moved her hand away when the appellant moved it to his penis, closed her legs to prevent the appel-

---

[50] *United States v. Pease*, 74 M.J. 763 (N-M. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 180 (C.A.A.F. 2016) (finding the evidence was not only insufficient to support that the complainants were incapable of consenting, but also sufficient to show "that the appellant reasonably may have believed that they were willing partners in the sexual activity").

[51] *United States v. Lewis*, No. 201900049, 2020 CCA LEXIS 199 (N-M. Ct. Crim. App. 2020).

[52] *Pease*, 74 M.J. at 770–71.

[53] *Pease*, 74 M.J. at 771.

[54] *Id.*

[55] *Id.*

lant from continuing oral sex on her, and turned her head away after the appellant put it in position for fellatio. Here, there is no evidence that the Victim was capable of consenting, aside from Appellant's self-serving narrative to the NCIS agents. Witnesses described the Victim's state immediately after the assault as "very scared, very confused, didn't know what happened."[56] Similarly, as discussed above, there was no credible evidence that the Victim was capable of physically declining or communicating an unwillingness to engage in the sexual activity.

After being roused by water and Petty Officer Mike yelling at Appellant, the Victim was able to understand Petty Officer Golf's limited, simple questions, and to respond with simple, one-word answers. However, as Dr. Jones testified, the complexity of the question matters in a capacity evaluation. Similarly, the Victim's ability to put pants on after being roused and to move to the couch with the support of walls and other objects "doesn't correlate necessarily with how well her brain is functioning to deal with any sort of complex situation that needs a rapid response, and . . . good response."[57]

Accordingly, the facts here create no reasonable doubt in our minds about the Victim's lack of capacity to consent.

 b. The Evidence is Factually Sufficient to Show Appellant Reasonably Should Have Known the Victim was Incapable of Consenting.

For the objective test of whether Appellant reasonably should have known the Victim was incapable of consenting, his level of intoxication is not a factor to be considered. What a person reasonably should have known refers to what an ordinary, prudent, sober adult would have reasonably known under the circumstances.[58] Under these circumstances, an ordinary, prudent adult would have reasonably known the Victim was incapable of consenting.

When Appellant left the restroom after urinating the first time, the Victim appeared unconscious with closed eyes and no movement. When Appellant asked to use the restroom a second time, the Victim's state had not changed. Immediately following the sexual activity, the Victim was still not moving. She appeared to be waking up, to be very confused, and to not know what happened.

---

[56] R. at 784.

[57] R. at 1017.

[58] *United States v. Shermot*, 77 M.J. 742, 746 (C.G. Ct. Crim. App. 2018).

The only evidence that the Victim was capable of consenting comes from Appellant's self-serving statements, each of which are refuted by witness testimony. Each of Appellant's assertions are contradicted by testimony and/or the video evidence entered at trial.

We are unpersuaded by Appellant's arguments. Appellant admitted he knew the Victim was highly intoxicated when she entered Petty Officer Mike's room with assistance. The observations of two other Sailors immediately before and after Appellant assaulted the Victim are strong indicators of what a reasonable person should have known under the circumstances. Appellant reasonably should have observed these same conditions and reached the same conclusion. In fact, that is exactly what occurred—according to his own statements, Appellant realized that the Victim was unaware of what was going on during at least a portion of the assault.

After taking a fresh, impartial look at the evidence, weighing the evidence and making allowances for not having personally observed the witnesses, we find Appellant's three convictions to be amply proven beyond a reasonable doubt.

## B. Appellant did not suffer unreasonable post-trial delay.

Prior to referral, the convening authority ordered an Article 32, UCMJ, preliminary hearing as well as a supplemental preliminary hearing. The preliminary hearing officer submitted both an initial report and a supplemental report to the convening authority. Enclosure (2) of the supplemental report was the audio recording of the supplemental hearing. Post-trial, the audio recording of the supplemental hearing could not be found and the Government was unable to produce it.

Appellant argues for this Court to grant 74 days of confinement credit for unreasonable post-trial delay related to the Government's unsuccessful attempts to produce the audio recording.

*1. Law.*

We review claims of excessive post-trial delay de novo.[59] "[T]he Court may provide appropriate relief if [an appellant] demonstrates . . . excessive delay in the processing of the court-martial after the judgment was entered into the record."[60]

---

[59] *United States v. Tabor*, 82 M.J. 637, 663 (N-M. Ct. Crim. App. 2022).

[60] Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2) (2019).

Since Appellant does not argue that his due process right to speedy post-trial review and appeal has been denied, we need only determine whether relief for unreasonable post-trial delay is necessary as a matter of our sentence appropriateness review.[61] We must determine whether the findings and sentence "should be approved" based on the entire record, including any unreasonable post-trial delay.

In discharging our Article 66 responsibilities regarding post-trial delay, we consider the following non-exhaustive list of factors:

(1) length of the delay;

(2) the reason(s) for the delay;

(3) the length and complexity of the record of trial and the number and complexity of potential appellate issues;

(4) any evidence of bad faith or gross negligence on the part of the Government in the post-trial review process;

(5) whether the appellant has asserted the right to speedy review;

(6) whether the appellant has made any showing of harm resulting from the delay; and

(7) the offense(s) of which the appellant was found guilty and the sentence.[62]

*2. Discussion.*

Appellant moved this Court on 24 January[63] to compel production of material missing from the Record. On 21 March, Appellant asserted he was prepared to file his brief but was unable to do so pending production of the missing material.[64] On 27 March, this Court granted the Motion and ordered production by 10 April. The Government produced what it believed to be all missing material on 10 April, but Appellant notified the Government on 22 April that an audio file from the supplemental Article 32, UCMJ, preliminary hearing was still missing. This Court declined to accept Appellant's attempt to file his brief on 30 May due to the pending production and ordered the missing audio file produced by 16 June. On 16 June, the Government informed Appellant and

---

[61] *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002).

[62] *United States v. Brown,* 62 M.J. 602, 606-07 (N-M. Ct. Crim. App. 2005).

[63] All dates discussed for this AOE occurred in 2023.

[64] Appellant's Mtn. for Fourth Enlargement of Time at 2.

the Court the missing file could not be produced. Appellant filed his brief on 26 June, asserting unreasonable post-trial delay.

We start our analysis by noting that Appellant's initial brief is ambiguous about when the delay began—he noted he was prepared to file his brief on 21 March but only requested additional confinement credit for the period beginning 10 April and ending on 16 June. Then, in his reply brief, he unequivocally asserted the delay began on 21 March and ended on 26 June. Nonetheless, even assessing the most generous period of delay—97 days from 21 March to 26 June—we find it was not unreasonable. Although the delay was entirely attributable to the Government, there is no evidence of bad faith or gross negligence. Rather, the delay was caused by a good faith search to find the missing audio file.

Appellant acknowledges there was no "material prejudice."[65] Rather, he argues he "suffered" by not being able to file his brief sooner.[66] Here, *Moreno's* presumption of unreasonable delay[67] does not apply because we are rendering our decision well within 18 months of docketing the case before this Court. We are aware of no case granting relief for appellate delay where the Court of Criminal Appeals rendered its decision within 18 months of docketing.[68] In fact, the case relied on by Appellant for his proposed post-trial delay test involves significant delay (253 days) between announcement of the sentence and docketing with the Air Force Court of Criminal Appeals, which then established the first factor to consider as "How long did the delay exceed the standards set forth in [*Moreno*]?"[69]

---

[65] Appellant's Br. at 39.

[66] Appellant's Br. at 39; *see also* Appellant's Reply Br. at 10.

[67] *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F 2006).

[68] *See generally United States v. Allison*, No. 201800251, 2021 CCA LEXIS 605, *13–16 (N-M Ct. Crim. App. 2021) (unexplained 109-day delay between convening authority's action and docketing with this Court); *United States v. Gay*, 74 M.J. 736, 743–45 (A.F. Ct. Crim. App. 2015) (unexplained delay of 141 days between announcement of sentence and convening authority's action, and 112 days between convening authority's action and docketing with the court of criminal appeals), aff'd, 75 M.J. 264 (C.A.A.F. 2016); *United States v. Ponder*, 2020 CCA LEXIS 38, *1–5 (Army Ct. Crim. App. 2020) (unexplained 296-day delay between announcement of sentence and the convening authority's action); *United States v. Reyes*, 2020 CCA LEXIS 49, *1–4 (Army Ct. Crim. App. 2020) (unexplained delay of 199 days between announcement of sentence and convening authority's action, and 91 days between convening authority's action and docketing with the court of criminal appeals).

[69] *Gay*, 74 M.J. at 744 (citing *Moreno*, 63 M.J. at 129).

Given that the reason for delay here is well-established—good faith attempts to produce missing material from the Record—and the presumption of unreasonable delay has not been triggered, we find no reason to conclude the delay was unreasonable or to grant sentence relief.

## C. Trial Counsel's Closing Argument was not Improper.

Appellant argues trial counsel's closing argument was improper in two ways. First, inclusion of selected excerpts of Appellant's statements to investigators on PowerPoint slides created a misleading understanding of what Appellant said.[70] Second, trial counsel misstated the law when defining "incapable of consenting." Appellant did not object at trial. We find no merit in either argument.

### 1. Law.

We review improper argument de novo; when there is no objection, we review for plain error.[71] Appellant carries the burden under plain error review and must show "(1) there is error, (2) the error is clear or obvious, and (3) the error results in material prejudice to [his] substantial right."[72] Accordingly, we "must determine: (1) whether trial counsel's arguments amounted to clear, obvious error; and (2) if so, whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different."[73]

The Court of Appeals for the Armed Forces [CAAF] has explained that

> Trial prosecutorial misconduct is behavior by the prosecuting attorney that oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense. Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon. Prosecutors have a duty to refrain from improper methods calculated to produce a wrongful conviction.[74]

---

[70] App. Ex. XCIII.

[71] *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)).

[72] *Id.* (citing *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017)).

[73] *Id.* (internal quotation marks and citations omitted).

[74] *Andrews*, 77 M.J. at 402 (internal quotation marks and citations omitted).

"[R]eversal is warranted only when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone."[75]

*2. Discussion.*

    a. Trial Counsel's Arguments did not Amount to Clear or Obvious Error.

Appellant's statements—including the screenshots of his phone's notes app,[76] his handwritten statement from 1 September,[77] the video of his NCIS interview on 2 November,[78] the timeline he verified on 2 November,[79] and his handwritten apology letter to the Victim[80]—were admitted at trial without objection. While discussing the elements of the offenses during closing argument, trial counsel referred to various parts of these statements. As a visual aid, trial counsel used PowerPoint slides containing excerpts of the admitted exhibits.[81] This was not error, let alone clear or obvious error.

Prior to closing arguments, the military judge instructed the members that "Incapable of consenting means the person is incapable of appraising the nature of the conduct at issue, or physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue."[82] During his closing, trial counsel stated, "Incapable of consenting means a person is incapable of appraising the nature of the conduct or physically incapable of *defying* or communicating an unwillingness to engage in sexual activity."[83] Appellant concedes the military judge instructed the members properly on the

---

[75] *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (internal quotation marks and citations omitted).

[76] Pros. Ex. 8.

[77] Pros. Ex. 6.

[78] Pros. Ex. 10.

[79] Pros. Ex. 11.

[80] Pros. Ex. 12.

[81] App. Ex. XCIII.

[82] R. at 1239,

[83] R. at 1260. (emphasis added). We note that, having listened to the audio, it is unclear whether trial counsel actually said "defying" or "declining" at this point in his closing. As we cannot conclusively say that trial counsel correctly recited the law, we will assume that he did not for purposes of our analysis.

meaning of incapable of consenting, but argues that trial counsel's use of "defying" instead of "declining participation in" and "sexual activity" instead of "sexual act at issue" was clear and obvious error.[84] We disagree. Trial counsel's minor misstatements did not overstep the bounds of propriety and fairness.

    b. Even Assuming Error, there is no Material Prejudice.

Prior to closing arguments, the military judge instructed the members that "the arguments of counsel are not evidence," to base determination of issues in the case on the evidence as they remembered it, and to apply the law as he instructed them.[85]

We are convinced that any error in trial counsel's closing argument had no effect on the members' findings. Following admission of Appellant's statements into evidence, each statement was published during the Government's case. Additionally, the exhibits and a copy of the military judge's instructions were provided to the members for further review during their deliberations. Members are presumed to follow a military judge's instructions and we find no reason to challenge that presumption here.[86] We find, therefore, that any impropriety in trial counsel's closing argument was remedied by the military judge's instructions and there was no material prejudice.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[87]

The findings and sentence are **AFFIRMED**.



FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[84] Appellant's Supp. Br. at 4.

[85] R. at 1253.

[86] *United States v. Fletcher,* 62 M.J. 175, 194 (C.A.A.F. 2005).

[87] Articles 59 & 66, UCMJ, 10 U.S.C. §§ 859 & 866.